## IN THE UNITED STATES BANKRUPTCY COURT FOR
## THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| In re:<br><br>**LOUIS TUCKER LINK AND VICKIE BOCOX LINK,**<br><br>Debtors. | Case No. 21-10221-M<br>Chapter 7 |
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**LOUIS TUCKER LINK,**<br><br>Defendant. | Adv. No. 21-01026-M |
| **ILENE J. LASHINSKY, UNITED STATES TRUSTEE,**<br><br>Plaintiff,<br><br>v.<br><br>**LOUIS TUCKER LINK AND VICKI BOCOX LINK,**<br><br>Defendants. | Adv. No. 21-01031-M<br>(Consolidated with Adv. No. 21-01026-M) |

### Closing Argument by **Louis Tucker Link and Vicki Bocox Link**

COMES NOW Debtor/Defendant Louis Tucker Link ("T. Link" or "Mr. Link") and Vicki Bocox Link  ("V. Link" or "Mrs. Link"))(together, "The Links"), through counsel Ron D. Brown, who give the following as their written closing argument due under the court's minute of May 15, 2024 requiring the parties to present simultaneous closing briefs 30 days from receipt of the trial transcript.  (Docket 40).

1

Since the trial transcript was finished on June 14, 2024, Plaintiffs and Defendants have both agreed August 13, 2024 is the proper briefing deadline and this pleading is timely filed.

## Introduction

This case is mostly about the discharge of tax *penalties.* Penalties that the United States of America ex rel. Internal Revenue Service ("IRS") has been unwilling to review for years.  From 2012-2015, the IRS put The Links through a comprehensive tax audit of all of their personal <u>and</u> businesses for tax years 2004 through 2012.[1]  During the audit, the IRS opened up a second examination related to transactions of Bermuda's Knightsbridge Foundation (see infra).[2]  The Links used multiple accounting firms to defend the lengthy examinations[3] and provided voluminous documents and explanations to the IRS.[4]

Once the IRS examinations were finally completed in late 2015 or early 2016[5], the IRS assessed substantial penalties-- individual tax penalties (because the business income and expenses ultimately flowed through to The Links) and penalties for transactions related to the Knightsbridge Foundation.[6]  The IRS auditors provided no restrictions on the Links amending their previously filed returns[7] and amendments were necessary to correct mistakes made by the IRS in the audit.[8]  Mr. Link received an assurance from IRS representative Mr. Duggan that all tax penalties would be removed once the IRS

---

[1] Transcript at 337.

[2] Transcript at 353.

[3] Ernst and Young, see Transcript 352. Mysock Chevallier, see Transcript at 375, 378, 431.  Ed Mysock provided professional services regarding the audit and Bill Chevallier provided assistance with the Foundation examination.  Transcript at 446.

[4] Exhibit 209, 387.  Ed Mysock testified he provided the IRS financial documents for Guggenlink, KiamichiLink, Knightsbridge Resources, Knightsbridge Link and 2 yachts.  Transcript at 433. The Links reported all proceeds from the KIL sales transactions in their tax returns from 2006 – 2012 and was evaluated in the audit.

[5] Transcript at 337.

[6] The penalties against the Foundation were assessed against the Links for failure to make certain foreign trust reporting disclosures.  Transcript at 447.

[7] Transcript at 434.

[8] Transcript at 434. The IRS determined losses were taken on yachts on the Links' original tax returns but in fact were not, thus causing inflated taxes due.

approved the Links amended tax returns.[9]   In November 2018, the Link amended the tax returns for

2008, 2012 and 2014.[10]   The Links' accountant also believed the Foundation penalties were incorrectly

calculated.[11]   In 2016, the Links promptly filed responses to questions given by the IRS[12] and filed a

Protest and Request for Appeals Conference.[13]   Today, the IRS has never addressed the 2012 amended

tax returns nor the 2016 Foundation tax protest letter.

The Links heard nothing from the IRS for over 5 years.[14]   No response, of any kind, to the tax

protest.[15]   Not a peep regarding the amended tax returns.[16]   So, they decided to file bankruptcy to get

relief from the exorbitant penalties which could never be paid back in their lifetimes.  Tax penalties are

normally dischargeable in bankruptcy[17] but when the Links filed seeking a discharge of the penalties the

IRS imposed but would not address, the IRS and UST objected to the Links' discharge using every effort

available to block relief.

Links' bankruptcy schedules show most of the debt is owed to the Internal Revenue Service

("IRS").[18]   On Schedule D, the IRS had filed tax liens totaling $28,800,064.38, with the only other

secured debt being a car loan of $14,046.30.[19]   The Links listed tax creditors of at least $539,895.06 on

Schedule F.[20]   On May 16, 2022, the IRS filed its Proof of Claim No. 4, for $18,538,299.90.[21]   The IRS

---

[9] Transcript at 436.
[10] Transcript at 337, 431.  Exhibits 279 and 280.
[11] Transcript at 448.
[12] Transcript at 450.  Exhibits 214 and 236.
[13] Transcript at 451.  Exhibits 239 and 240.
[14] Transcript at 388.
[15] Transcript at 452.
[16] Transcript at 434-435.
[17] "The test for the determination of the dischargeability of a tax penalty is based on the date of the underlying transaction or event that gave rise to the penalty, not the dischargeability of the underlying tax." *In re Allen*, 272 B.R. 913, 916 n.1 (Bankr. E.D. Va. 2002); *see Aikman v. IRS* (*In re Aikman*), 554 B.R. 95, 99 (Bankr. W.D. Pa. 2016).
[18] Transcript 94.
[19] Exhibit 1, pages 21-23.
[20] This total includes IRS, Oklahoma Tax Commission and General Revenue Corporation. It could be more because one of the IRS entries is listed in an "unknown" amount.
[21] Exhibit 188.

claim shows only $69,056.22 as secured, $800 in unsecured priority debt, $1,749,903.36 in unsecured non-priority debt, $2,178,426.26 in interest on the unsecured debt[22], and the rest being a whopping $14,540,114.06 in penalties.[23]

The IRS has chosen a path to pursue the Links at all costs, choosing to ignore anything that could help the Debtors.  The Links would understand if the IRS claim was all for taxes actually due, including interest.  But they remain perplexed as to why the IRS would not address the amendments and protest first before making this large claim.  The IRS filed a claim *without* addressing the amended tax returns or the tax protest.  Eventually in March 2023, after this adversary was filed, the IRS did send an adjustment letter to the Links' accountant addressing the 2008 amended tax returns[24].  The IRS reduced 2008 taxes owed by $781,560, reduced a failure to file penalty by $195,390 and reduced interest owing by $156,973.45, for a total reduction of $1,133,923.45.[25]   Even after providing the 2023 letter, the IRS has yet to amend its Proof of Claim No. 4.  Today, the IRS has never addressed the 2012 or 2014 amended tax returns.  Nor has the IRS ever addressed the Links' 2016 Foundation tax protest.[26]

## Background Facts

*Knightsbridge Investments, Ltd: The company that laid the golden egg.*

In 2001, Mr. Link moved to London, England to work for a Bermuda domiciled petroleum company, Nimir Petroleum ("Nimir") which was owned by two Saudi Arabian brothers.[27]  Link began as an

---

[22] Except for 2008, 2012 and 2016, the interest is accrued on the penalties.
[23] Exhibit 100 are IRS Tax Account Transcripts, which show penalties for 2006 ($3,776,667), 2007 ($1,388,372), 2008 ($750,076), 2009($1,981,470), 2010 ($223,464), 2011 ($963,109), 2012($2,788,870), 2013 ($20,000) and 2014 ($20,000).  The sum of these numbers is $11,911,728.  The penalties assessed in the IRS' proof of claim are shown to be 14,540,114.06, which obviously does not match the tax transcripts.  The difference would not seem to be interest, because interest on the penalties is listed separately on the claim.
[24] Transcript at 337.
[25] Exhibit 285.
[26] Link states the Foundation penalties should total $5,000, based on advice from his accountant.  Exhibit 2, page 33.
[27] Trial Transcript attached as Closing Exhibit A, at pages 36, 37.  Hereinafter, referred to as "Transcript".

analyst and became Chief Operating Officer six months later.[28]  In 2004, Link and other senior

management offered Nimir's owners a management buyout, which was accepted.  The buyout netted

Link a 55% ownership interest in Knightsbridge Investments, Ltd ("KIL"), the purchasing company

organized in Bermuda. [29]  About a year after the management buyout, KIL sold the oil and gas properties

to a French company.[30]

    KIL set up subsidiaries, Knightsbridge Chemicals to run Nimir's chemical plants (which were not

initially sold as part of the management buyout)[31] and Knox Marine, Ltd created later to own and pay

for 2 expensive yachts).[32]  Before the transaction closed, Link transferred 5% of his KIL ownership to a

newly formed non-profit, called The Knightsbridge Foundation (the "Foundation").[33]  A visual summary

of these international companies was included in Debtors' bankruptcy schedules[34] and is attached as

Closing Exhibit B.  All of the money Link received from the sale of Nimir went to KIL and the

Foundation.[35]

*How was the money spent?*

    The sale of Nimir netted KIL and the Foundation about $100M pre-tax and $60-65M post-tax.[36]

---

[28] Id at 37.

[29] Id at 39-40.  Nimir was also organized in Bermuda so it was easiest to create a new buyer company in the same locale.

[30] Exhibit 205.

[31] Link testified the chemical business was a loser, because the plants were old and were marked with corruption in the countries where they operated.  Exhibit 2, page 29.

[32] A KIL company flowchart is attached as Closing Exhibit B for the court's convenience to understand the company relationships.

[33] Transcript at 43.  The Foundation paperwork was completed in June 2004 but not approved by Bermuda until 2006.

[34] Exhibit 1, pages 83 and 84.  Also, See Exhibit 10.

[35] KIL and the Foundation then distributed or loaned funds to Knightsbridge Link, LLC and Knightsbridge Resources, LLC and related United States Companies.

[36] Transcript at 42, 355.

*The Foundation*

The Foundation was a charitable trust created in Bermuda.[37]  The Links became trustees of the trust[38] but neither were a beneficiary or owner.[39]  The purpose of the Foundation was "for the purpose of benefiting children, elementary, middle age, middle school, or high school aged and for their, the benefit and care and feeding of those kids."[40]   Link explained there were social concessions required of oil and gas companies to do business in those countries.[41]  The Foundation was not a liquidating charitable trust, but could be used for investment purposes to grow the trust estate.[42]  The Links were trustees but did not have a beneficial interest in the Foundation; and no entity that the Links had an interest in had an interest in the Foundation.[43]  The Bermuda Charter Bank trustee's closed the Foundation around 2019.[44]

The Foundation received about $14-15M in late 2006.[45]  The Foundation contributed $500,000 to St. Francis Hospital in Tulsa, Oklahoma and $500,000 to Oklahoma State University Foundation.[46]  Link caused the Foundation to make loans to various entities indirectly owned by Link.[47]  Link has provided the Plaintiffs, and this court, with a master spreadsheet prepared by his accountant showing every banking transaction from every account during the lifetime of the Foundation.[48]  By 2014 or 2015, all money was spent from the Foundation.[49]

---

[37] Transcript at 446-447.  See Trust Deed at Exhibit 206.
[38] After the original trustee died.
[39] Transcript at 447.
[40] Id at 43.
[41] Transcript at 304.
[42] Transcript at 48.
[43] Transcript at 135-136, 205.
[44] Transcript at 136.
[45] Id at 44, 46,
[46] Transcript at 46.
[47] The loans were made primarily to Guggenlink and Knightsbridge Resources. Transcript at 50, 61, 207. There was an occasion where a $500,000 wire transfer was sent to Eric Link to purchase materials for a chemical company, because the supplier would not accept Egyptian currency. Transcript at 390.
[48] Exhibit 175.  The spreadsheet includes every bank account.  Transcript at 377.
[49] Transcript at 206.

*The Chemical Companies*

Knightsbridge Chemicals ("Chemicals") was a Bermuda "umbrella company" for several foreign chemicals companies, including International Chemicals Company SAE of Egypt ("Chemicals Egypt")(sold in 2019),[50] DMCC-Dubai (sold in 2012),[51] and Nimir Chemicals (UAE) Limited.[52]  While living in Dallas, the Links' son Eric Link ran the chemicals company in Egypt.[53]  The last Chemicals business, Chemicals Egypt, was sold for debt in 2019.[54] The sale produced no funds to the Links[55] and the notes receivable owed to Chemical Egypt from any of Link's entities were transferred to the buyer as part of the transaction closing.[56] In some circumstances, KiamichiLink provided funds for Chemicals which would have been recognized as a loan from Chemicals to KiamichiLink.[57]  The Foundation gave loans to Chemicals also.[58]  KiamichiLink used $750k of sale proceeds in 2018 to loan to Chemicals hoping Chemicals Egypt would soon be sold for a profit.[59]  Link believed he could sell Chemicals Egypt in 2018 for a profit[60] of $2.5M but that transaction fell through[61] and it was sold in 2019 for only debt.[62] There was limited accounting and banking records available from the Egyptian Chemicals company.[63] Mr. Link was not the accountant for the Chemicals companies; he did not have copies of any bank statements for the last 10 years and could not give them to the chapter 7 trustee.[64]

---

[50] Transcript at 263-264. Exhibit 2, page 29.  Exhibits 179 and 226.
[51] Transcript at 265.
[52] Exhibit 200. No documents exist for the sale of this business.  Transcript at 412.
[53] Transcript at 171.
[54] Transcript at 171.
[55] Transcript at 13.
[56] Transcript at 407, 411-412.
[57] Transcript at 190-191, 197.
[58] Transcript at 196.
[59] Transcript at 212-213.
[60] Transcript at 369.
[61] Transcript at 306. See Exhibit 17B, page 4-5.
[62] Transcript at 310-313. Exhibit 2, page 29.
[63] UK lawyer Julia Mahmood kept them until 2012.  Exhibit 2, page 52.
[64] Transcript at 171-172.

*United States Entities*

In 2006, the Links set up revocable trusts ("The Revocable Trusts") for themselves[65] and irrevocable trusts[66] for their children Eric Link and Andrea Walker[67] ("The Children's Trusts").  At all relevant times, the trustees for the revocable trusts were the Links[68] and the trustee for the Children's Trusts was Robert Scott.[69]  Through their attorneys[70] that same year in 2006, the Links caused The Children's Trusts to own Guggenlink, LLC ("Guggenlink") and KiamichiLink, LLC ("KiamichiLink"), two Oklahoma limited liability companies.[71] A visual summary of these United States Companies, and others mentioned below, was given to the Plaintiffs[72] and is attached as Closing Exhibit C.

*Guggenlink (Tulsa Real Estate)*

Guggenlink was a company designed to own and operate real estate.[73]  Guggenlink's primary assets included a 9,000 ft$^2$ house on Southern Hills Golf Course (the "Big House"),[74] the 3,000 ft$^2$ "Granite Court House"[75], and the 4000-4500 ft$^2$ "Nandina House".[76]  Each home was occupied and subject to rental agreements.[77]  The Links bought the Big House in 2008 for $3.5M and spent another $3.5-$4M in improvements, and lived in that house from 2008.[78]  Even though they lived there, the Links did not pay personal home expenses because the expenses of the real estate were borne by

---

[65] The L. Tucker Link Revocable Trust and Vickie Sue Link Revocable Trust.  Transcript at 54, 55, 134.
[66] Transcript at 442.
[67] Eric Knightsbridge Link Trusts A &B and  Andrea Knightsbridge Link Trusts A&B.
[68] Transcript at 62.
[69] Transcript at 61.  Robert Scott was a friend and coworker from 2004-2005 at Knightsbridge Resources.  Transcript 62.
[70] Fulbright and Jaworski, New York and Washington DC lawyers.  Transcript at 51, 59.
[71] Eric Knightsbridge Link Trusts B and  Andrea Knightsbridge Link Trusts B owned these 2 entities equally.
[72] Exhibit 120.
[73] Transcript at 82-83.
[74] 3201 East 65th Street, Tulsa.  Transcript at 51, 52.
[75] 7539 South Granite Court, Tulsa. Transcript at 76.
[76] 10620 Nandina Court, Jenks.  Transcript at 76.
[77] Transcript at 203. Exhibit 135.
[78] Transcript at 52.

Guggenlink as a real estate investment company.[79]  Initially, the Links borrowed funds from Grand Bank to buy the Big House; Link was a guarantor of the mortgage loan.[80]  In 2010, The Foundation purchased the mortgage from Grand Bank through an assignment.[81]  From 2008 until 2010, Guggenlink made monthly mortgage payments to Grand Bank mortgage servicer which Grand Bank paid to the Foundation from 2010 until 2012.[82]  In 2012, Guggenlink took out a new mortgage loan with F&M Bank which paid off the Foundation's assigned mortgage.[83]

From 2015-2016, the Links started to enter "liquidation mode" as resources were running low.[84]  The Links tried to market the Big House for sale in 2018 and used money to fix the swimming pool.[85]  In 2018, the Links received a contract offer which would have paid off the mortgage to F&M Bank[86] but the IRS would not release its tax liens[87] to accommodate the sale.[88]  The bank foreclosed the Big House in August 2020[89].

*KiamichiLink, LLC (The Ranch)*

*KiamichiLink* primary asset was a 11,400 acre ranch[90] in Southeast, Oklahoma (the "Ranch") which it operated until March 2018.[91]  KiamichiLink bought [92] the Ranch in 2007 for $9M[93] and made

---

[79] Transcript at 83, 192.
[80] Transcript at 53.
[81] Transcript at 57, 58.
[82] Transcript at 58.
[83] Transcript at 58.  Link testified the payoff was between $4.5 and $5M which was deposited into the Foundation bank account. Transcript at 59.  Exhibit 132 shows the payoff to be $4,324,887.27 which is included within the Foundation Spreadsheet Summary at Exhibit 175-10 (October 2012 entry of deposits into Fidelity Account).  The Granite Court House and the Nandina House were also paid off at the same time- 3 loans total.  Transcript at 76-77.  F&M paid Grand Bank which, in turn, paid the Foundation.  Transcript at 78.
[84] Transcript at 366.
[85] Transcript at 367.
[86] F&M Bank changed names to Prosperity Bank.
[87] Exhibit 134, tax liens for $3,115,791 for tax years 2008 and 2012.
[88] Transcript at 368, 401.
[89] Transcript at 83.
[90] Transcript at 256.
[91] Transcript at 60, 83.
[92] Transcript at 77, 364.
[93] Transcript at 364.

$10M-$14M in improvements[94] using funds borrowed from Knightsbridge Resources[95] and the

Foundation.[96]  Also, KiamichiLink owned 2 wholly owned subsidiaries, KLR Angus, LLC (cattle sales)

and KLR Genetics, LLC (embroyos and semen sales).  The subsidiaries also borrowed money from

Knightsbridge Resources.[97]   The subsidiaries stopped doing any business in 2016.[98]

      The Ranch was a for-profit cattle operation.[99]  For a time, the Links lived at the Ranch while also

living in Tulsa at the Big House.  The Links always dreamed of owning a ranch and wanted to "leave

something behind" for their kids.[100]  KiamichiLink did not pay personal expenses for the Links but did

pay operating expenses for the property, including utilities; the expenses of the real estate were borne by

the company as a real estate investment expense.[101]  The Ranch was sold in a two-part transaction, a sale

with a repurchase option in 2017 and the final sale in 2018.[102]  Proceeds from the sale of the Ranch were

used to make inter-company loans to Guggenlink[103], Knightsbridge Resources[104], loan repayments to L.

Tucker Link Revocable Trust[105], loan payoffs to First Bank[106] and several payments to Chemicals,[107] and

payments to Bermuda Commercial Bank.[108]  Knightsbridge Resources reported the loans as assets on

schedule L to its tax returns.[109]

---

[94] Transcript at 364.
[95] Transcript at 60, 78, 365.
[96] Transcript at 60.
[97] Transcript at 365.
[98] Transcript at 104-105.
[99] Transcript at 364.
[100] Transcript at 65.
[101] Transcript at 83, 192.
[102] Transcript at 273.
[103] Transcript at 275, 296, 301.
[104] Transcript at 276.
[105] Transcript at 279, 281.
[106] Transcript at 282.
[107] Transcript at 286, 288-289, 297-298.
[108] Transcript at 287, 299
[109] Transcript at 274-375.  For example, $49M was shows as owed on the company's 2015 tax returns. Exhibit 218, page 17.

*Knightsbridge-Link, LLC*

Through ownership by the Revocable Trusts and the Children's Trusts[110] the Links established Knightsbridge-Link, LLC ("Knightsbridge-Link") in 2000.[111]   At the time of bankruptcy filing, the only entity Knightsbridge-Link owned was a 50% interest in Knightsbridge Partners, LLC ("Knightsbridge Partners"), an entity that Mr. Link used to draw a monthly consulting salary (when funds were available).[112]   Knightsbridge Partners' largest customer was the Ardmore Development Authority (ADA).   Knightsbridge Partners researched public funding grants available to the ADA.[113]   In July 2019, Knightsbridge Partners entered into a Grant Services Agreement with ADA with pre-defined scope of services to be provided as an Addendum I to the contract.[114]   New contracts for additional scope of services were created later, including Addendum II on September 21, 2020,[115]   Addendum III April 21, 2022[116], and Addendum IV on September 19, 2022[117].

ADA funded limited "Raise Grant" consulting budgets to Knightsbridge Partners from which Mr. Link's (and others) monthly consulting salaries were paid.[118]   As of the date the bankruptcy was filed on March 5, 2021, Knightsbridge Partners had roughly $200,000-$300,000 in its bank account, according to Mr. Link's testimony.[119]   To be precise, there was $296,821 in the Knightsbridge Partners checking account as of Marh 4, 2021.[120]   Link testified those funds were set aside for the monthly consulting

---

[110] Transcript at 66.   The Recovable Trusts each owned 46.5% of Knightsbridge-Link, along with Eric Knightsbridge Link Trust A (1.75%), Andrea Knightsbridge Link Trust A (1.75%), Eric Knightsbridge Link Trust B (1.75%) and Andrea Knightsbridge Link Trust B (1.75%).
[111] Transcript at 65.
[112] Transcript 67.
[113] Transcript at 146.
[114] Transcript 69.  Exhibit 9B, pgs 4-9.
[115] Exhibit 9B, pps 10-13.
[116] Exhibit 9B, pps 46-49.
[117] Exhibit 9B, pps 56-59.
[118] Transcript at 73, 107.  The original monthly consulting rate was $7500/month.  Transcript at 74. Exhibit 1 , pg. 39. Increased to $10,500 monthly February 2022. Exhibit 9B, pps. 32-38, 55.  Increased to $12,500 monthly Jan 1, 2023. Exhibit 9B, pps. 80-83.
[119] Transcript at 71.
[120] Exhibit 17F, page 39.

salaries of himself, Michael Carnuccio and William Walker, as well as subcontractors-- engineers, consultants and attorneys-- involved in the grant writing processes.[121]  ADA approved a consulting budget[122] and there were offsetting subcontract expenses contemplated for those funds.[123]  Link's monthly consulting income is reported as a flow through—as a K-1 to Knightsbridge-Link and then from there as a K-1 to Link.[124]

None of the Addendum contracts produced any substantial revenue for Knightsbridge Partners, except Addendum IV.   On December 1, 2022, the Oklahoma legislature approved Funding for Progressing Rural Economic Prosperity Funds (PREP) which provided $25M in funding to the ADA.[125]  Knightsbridge Partners negotiated with ADA for a reduction in its consulting fees in exchange for immediate payment of $3,146,875, paid between February 28, 2023 and March 3, 2023.[126]  As of date of trial on May 14, 2024, Link testified that ADA had not yet received any funding from the State of Oklahoma.

*Knightsbridge Resources:  The Biodiesel Plant (aka "Biodiesel Disaster")[127]*

Knightsbridge Resources, LLC ("Knightsbridge Resources") was a holding company for Knightsbridge Biofuels, LLC ("Knightsbridge Biofuels") and Ecogo Biofuels, LLC, both of which ran a biodiesel plan in South Carolina (collectively, the "Plant").[128]  The Plant cost $16-18M to build[129] and was certified for operations the last 3 months of 2007.[130]  For the first 6-7 months of the operation, the

---

[121] Transcript at 73.
[122] Transcript at 330.
[123] Transcript at 147.
[124] Transcript at 130.
[125] Exhibit 9B, pps. 61-77.  Trial testimony shows there was $50M in appropriated funds.  Transcript at 215, 220.
[126] Exhibit 9B, pps. 78-79
[127] See Closing Exhibit D for visual flowchart of Knightsbridge Resources companies.
[128] Transcript at 334.
[129] Transcript at 362.
[130] Transcript at 360.

Plant generated a million gallons of biodiesel fuel each month, during which the federal government paid $1 per gallon subsidy for each gallon made from soybean oil.[131] The Plant obtained soybean oil from a soybean processing facility next to the Plant.[132] Most of the fuel was exported to Europe for sale.[133] The Plant profited about $1 per gallon, essentially the amount of the federal government subsidy.[134] Two significant challenges affected the Plant in 2008. First, the European Union began assessing a $1.45/gallon tariff on imported biodiesel fuel which meant the Plant began losing 45 cents a gallon.[135] Second, the price of soybean oil increased from 19 cents a pound to 60-65 cents a pound,[136] triggering the biodiesel productions cost to quickly exceed the resale price.[137] Also there was shipping tanker blocked from transport to Europe which cost the company another $1.7M in losses.[138] During the Plant's operations, Knightsbridge Resources and the Foundation[139] made substantial loans to Knightsbridge Biofuels totaling 25,640,193.[140] The Biodiesel Plant stopped operations in 2011 or 2012.[141] The real estate and equipment was foreclosed by the county in 2014[142] for failure to pay $2.8M in real estate taxes.[143] The total Plant losses exceeded $33M.[144]

---

[131] Transcript at 360.

[132] Transcript at 361.

[133] Transcript at 361.

[134] Transcript at 361.

[135] Transcript at 361.

[136] Transcript 361-362.

[137] Transcript at 362.

[138] Transcript at 362.

[139] Transcript at 363.

[140] Transcript at 359.  Exhibit 154 shows loans for $100,000 (page 16), $500,000 (page 13), $3,000,000 (page 10), $2,137,500 (page 7), $1,800,000 (page 4), $4,000,000 (page 1), $500,000 (page 31), $1,599,128 (page 28), $8,211,955 (page 25), $2,241,610 (page 22), $650,000 (page 19).

[141] Transcript at 334.

[142] Transcript at 335.

[143] Transcript at 362-363.

[144] Transcript at 363.

*The Bankruptcy Filing*

The Links reviewed and signed their bankruptcy papers on March 4, 2021.[145]  The bankruptcy

paperwork was filed on March 5, 2021.[146]  On April 16, 2021, Mr. Link testified at his 341 exam.[147]

Plaintiff Ilene Lashinsky, United States Trustee ("UST") filed an adversary objecting to the Links'

discharge under 11 USC §727(a)(2)(a)(3), (a)(4) and (a)(5).[148]  The IRS filed an adversary objecting to

the Link's discharge under 11 USC §727(a)(4) and (a)(5) and seeking a determination that the 2008 and

2012 tax liabilities were non-dischargeable under 11 USC §523(a)(1)(C).[149]  This court consolidated the

trial regarding the §727 counts and conducted a 3 day trial May 13-15, 2024.


**Closing Argument: Law and Analysis**

The Links address the following counts asserted by Plaintiffs United States of America ("IRS") and

Ilene J. Lashinsky, United States Trustee ("UST") as grounds for denial of discharge, in the Pretrial

Order entered at Docket 37, pages 50-51.

I.    <u>Transfer of Estate Property Within 1 Year of Filing</u>

11 USC 727(a)(2) provides:

**(a)** The court shall grant the debtor a discharge, unless—

**(2)** the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate
charged with custody of property under this title, has transferred, removed, destroyed,
mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or
concealed—
   **(A)** property of the debtor, within one year before the date of the filing of the petition; or

---

[145] Transcript at 90.
[146] Exhibit 1, page 6.
[147] Exhibit 2.
[148] Pretrial Order, pages 2-6.
[149] Pretrial Order, page 6.

**(B)** property of the estate, after the date of the filing of the petition;

Fed. R. Bankr. P. 4005 places the burden of proof on party objecting to discharge. A preponderance of the evidence standard applies to action under 11 U.S.C.S. § 727(a)(2)[150]. 11 "U.S.C. § 727(a)(2)(A) does not apply every time a debtor transfers property—rather, it applies when a debtor transfers property of the debtor."[151]  For example, a LLC interest "is personal property and member has no interest in specific limited liability company property.". Because the LLC's property is not "property of the debtor", a Debtor's transfers of the LLC's property are not material facts for the Debtor's individual bankruptcy case.[152]

This follows Oklahoma law whereby creditors may only use charging orders against company stock or LLC membership interests.  Statutory charging order "shall be the sole and exclusive remedy of a judgment creditor with respect to the judgment debtor's membership and capital interest, whether the limited liability company has one member or more than one member."[153]  This logic extends in the bankruptcy context to 11 USC 727(a)(2), which requires that the property being transferred within 1 year be "property of the debtor".  The membership interest must be the property transferred within 1 year to offend the bankruptcy court; it is irrelevant if property owned by the LLC was transferred within 1 year of the bankruptcy filing.  Because the LLC's property is *not* debtor's property.

Plaintiffs ask the court to find they transferred or concealed property 1) their own property, with an intent to hinder, delay or defraud creditors, within 1 year of the bankruptcy filing or 2) property of the

---

[150] Lashinsky v. Green (In re Green), 2022 Bankr. LEXIS 1354, *1
[151] Id.
[152] Id, citing Kansas law. Kan. Stat. Ann. § 17-76,111.  Oklahoma has a similar law.  Okla. Stat. tit. 18, §2032 says "A capital interest is personal property. A member has no interest in specific limited liability company property."
[153] Lifetouch Nat'l Sch. Studios Inc. v. Okla. Sch. Pictures, LLC, 2024 OK CIV APP 17, P52

estate after the bankruptcy filing as alleged within Count 3 of the UST's complaint.[154]  The Plaintiff
have not proven the following alleged fraudulent transfers within Count 3 of the UST's complaint.

    a.  Foundation.  Link testified at his 341 meeting that the Foundation was not operating and had
no assets.[155] By 2014 or 2015, all money was spent from the Foundation.[156]  The Bermuda
Charter Bank trustee's closed the Foundation around 2019.[157]  Because Debtors did not own
this Bermuda trust and the trust did not have assets for over 1 year before the bankruptcy,
Plaintiffs cannot prove a violation of 11 USC 727(a)(2).

    b.  KLR Angus, LLC.  Link testified at his 341 meeting that KLR Angus was inactive since
2016.[158]  He repeated the same as his 2004 exam[159] and at his deposition[160]. Debtors never
had ownership of KLR Angus.  KLR Angus' checking account at Grand Bank was closed in
2018.[161] Because Debtors did not own this company and the LLC did not have assets for over
1 year before the bankruptcy, Plaintiffs cannot prove a violation of 11 USC 727(a)(2).

    c.  KLR Genetics, LLC.  Link testified at his 341 meeting that KLR Genetics was owned by
KiamickiLink.[162] He testified at his 2004 exam[163] and at his deposition[164] that KLR Genetics
last did business in 2016. Because Debtors did not own this company and the LLC did not
have assets for over 1 year before the bankruptcy, Plaintiffs cannot prove a violation of 11
USC 727(a)(2).

---

[154] Pre-trial Order, pages 23-24, ¶4.
[155] Exhibit 2, pages 38-39.
[156] Transcript at 206.
[157] Transcript at 136.
[158] Exhibit 2, page 53.
[159] Exhibit 3, page 57.
[160] Exhibit 4, page 232.
[161] Exhibit 5, page 50.
[162] Exhibit 2, page 54.
[163] Exhibit 3, page 58.
[164] Exhibit 4, page 232.

d.  Cowboy Holdco, LLC.  Link testified at his 341 meeting[165] and his 2004 examination[166] that Cowboy Holdco was affiliated and owned, in part, by Knightsbridge Partners.  The Links did not own Cowboy Holdco, LLC.[167]  It was organized with the Secretary of State 1 month before the bankruptcy filing, on February 12, 2021.[168]  Cowboy Holdco, LLC's only asset at the time of the bankruptcy filing was a lease option[169] for the South Side of the Ardmore airport.[170]  Later, Cowboy Holdco opened a checking account at Regent Bank on May 24, 2021, after the bankruptcy filing.[171]  The approval of the sublease option was approved by ADA on August 22, 2021, again after the bankruptcy filing.[172]  Because Debtors did not own this company, Plaintiffs cannot prove a violation of 11 USC 727(a)(2).

e.  WP Global, LLC.  Link testified at his 2004 exam that WP Global, LLC is a business that owns a real estate lease option on the West side of the Ardmore airport.[173]  Link testified at his deposition that he did not believe this company was even created until after the bankruptcy was filed.[174]  But unknown to Link, William Walker registered WP Global, LLC on March 3, 2021[175], the day before the Links signed their bankruptcy schedules. The operating agreement was not even signed until March 15, 2021.[176]  Link became registered agent for WP Global, LLC on June 2, 2022, over a year after the bankruptcy filing.[177]  The

---

[165] Exhibit 2, page 58.
[166] Exhibit 3, page 59.
[167] Exhibit 2, page 59.
[168] Exhibit 24, page 1.
[169] Dated October 1, 2020.  Exhibit 30, page 1.
[170] Exhibit 3, page 61.
[171] Exhibit 17I, page 4.
[172] Exhibit 29.
[173] Exhibit 3, page 61.
[174] Exhibit 4, page 248.
[175] Exhibit 21B, page 1.
[176] Exhibit 21A, page 23.
[177] Exhibit 21A, page 23, Exhibit 26.

Links had no ownership interest in the company.[178]  Because Debtors did not own this company, Plaintiffs cannot prove a violation of 11 USC 727(a)(2).

f.   Garfield County Minerals.  Mr. Link testified his wife had a family partnership interest in Bocox Family Partnership, a family partnership which owned a farm in Garfield County, Oklahoma.[179]  Link testified at the 341 meeting that Bocox Family Partnership sold the farm in 2019 which netted Ms. Link about $113,000.[180] Bocox Family Partnership sold the land but kept the mineral interests; but no mineral royalties were received from 2019[181] because the wells quit producing[182].  Originally, the Links disclosed 2019 income from the Bocox Family Partnership farm sale[183] but did not disclose the kept mineral interests in Garfield County as "real estate" on their bankruptcy schedules.[184]  On December 8, 2021, the Links amended Schedule A/B to include the mineral rights.[185]  The Links provided their 2016 and 2017 K1s from the mineral royalties[186] and summarized oil and gas activity to the trustee.[187]  The initial omission was inadvertence and was explained at the 341 meeting; there was no intent to hide this information from the trustee.  Debtors believe the royalties are "worthless."[188]  Debtors may change their bankruptcy schedules under Bankruptcy Rule 1009.

---

[178] Exhibit 3, page 62.  ½ of the LLC was owned by Cowboy Holdco and ½ by Watco Companies (an unrelated Kansas company).
[179] Exhibit 2, page 43.
[180] Exhibit 2, page 44.
[181] Exhibit 3, page 73.
[182] Exhibit 3, page 74.
[183] Exhibit 1, page
[184] Exhibit 1, page 12.
[185] Exhibit 1, page 75, 93.
[186] Exhibits 261 and 262.
[187] Exhibit 263.
[188] Transcript at 326.

As for 11 USC 727(a)(2), the Links did not transfer any mineral royalties within a year before the bankruptcy or after the bankruptcy was filed.

g.  $910,692 'refund' from 2018 amended tax return. This amended return came after the IRS audit was completed and the Links were told they could amend their tax returns and use a net operating loss (NOL) carryforward.[189] So, on November 18, 2018, Debtors amended their 2008 and 2012 tax returns.[190]  The 2008 tax returns showed a refund of $910,692[191] which was computed after application of the NOL and explained to the IRS.[192]  The Links' 2015 tax returns showed the NOL in 2015 to be $1,121.558.[193]  When the Links filed their bankruptcy schedules, the IRS had not addressed the amended 2008 tax returns so Debtors include a NOL valued at "unknown" on their bankruptcy schedules.[194]  To clear any possible confusion, Debtors amended their Schedule A/B to show that any 2008 tax "refund" would be used to offset existing tax liability and there was no real "refund" due to them.[195]  There would never be a refund from 2008.[196]  Eventually, the IRS adjusted tax liabilities owed under the amended 2008 tax return but there was no refund due the Links.[197]  Regarding 11 USC 727(a)(2), the Links transferred no tax refunds within a year before the bankruptcy or after the bankruptcy was filed.

h.  Business bank accounts.  Link provided a disclaimer on his bankruptcy schedules A/B he had signatory authority on various businesses.[198]  He later amended his A/B schedules to show

---

[189] Exhibit 3, page 64.
[190] Exhibits 279 and 280.
[191] Exhibit at 279, page 1.
[192] Exhibit 270 at page 3.
[193] Exhibit 23B, page 140.
[194] Exhibit 1, page 17.
[195] Exhibit 1, page 80.
[196] Transcript at 80, 108.
[197] Exhibit 285.
[198] Exhibit 1, page 18.

there may be other accounts in which was a signor,[199] including showing he was a signor on the trust checking account.[200] On September 22, 2021, Link disclosed and provided bank statements to the UST's office for business bank accounts for which he was a signor.[201] On March 28, 2023, Link provided discovery responses showing the bank statements from Debtors.[202] UST now complains that Debtors made transfers of bank accounts since within 1 year of the bankruptcy filing.

First, there is no evidence of any transfers.  Second, the UST has provided no proof of fraudulent intent for these non-existent transfers.  Most of these accounts had minimal or no balances at the time of the bankruptcy filing.  Link testified that he didn't initially list the business accounts because he didn't own them.[203]

1)  JP Morgan Chase 1567 (L Tucker Link or Vickie Link).  Debtor provided statements for this account.[204]  This account has a $0 balance as of December 1, 2020.[205]

2)  JP Morgan Chase 4001 (Tucker Revocable Trust). Debtor provided statements for this account.[206]  Link testified this account has a $0 balance for several years.[207]

3)  JP Morgan Securities LLC 2062 (Tucker Revocable Trust). Debtor testified at his 2004 exam this account was open at the time of the bankruptcy but it had no

---

[199] Exhibit 1, page 82.
[200] Exhibit 1, page 82.
[201] Exhibit 6, pages 13-16.
[202] Exhibit 5, pages 49-58.
[203] Transcript at 327.
[204] Exhibit 6, pages 13-16.  Exhibit 5, page 52.
[205] Exhibit 15A, pages 1,3.
[206] Exhibit 6, page 15. Exhibit 5, page 51. Exhibit 15B, page 16 showing $.22 balance as of March 1, 2021.
[207] Exhibit 3, pages 38.

money.[208]  Debtor provided 5 years of bank statements for periods before the bankruptcy filing.[209]  The balance at the time of the bankruptcy filing was 0.[210]

4)  JP Morgan Chase 3004 (Foundation). Debtor testified at his deposition that this account was open at the time of the bankruptcy but it had minimal money.[211]  Debtor provided 10 years of bank statements for periods before the bankruptcy filing.[212]  The balance at the time of the bankruptcy filing was 35.11.[213]

5)  JP Morgan Securities 2305 (Foundation). Debtor testified at his deposition that this account was open at the time of the bankruptcy but it had no money.[214]  Debtor provided almost 10 years of bank statements for periods before the bankruptcy filing.[215]  The balance at the time of the bankruptcy filing was $0.[216]

6)  JP Morgan Chase 3008 (K- Link). Debtor testified at his 341 exam[217] and deposition[218] that this account was open at the time of the bankruptcy. Link provided 5 years of bank statements and disclosed through email to the trustee he was a signor on this business account.[219]  The balance as of the bankruptcy filing was $1960.16.[220]

7)  JP Morgan Securities 1475 (K-Link). Debtor disclosed on his bankruptcy schedules[221] and testified at his 341 exam that a Knighsbridge-Link account at Chase had a

---

[208] Exhibit 4, page 237.
[209] Exhibit 5, page 51. Exhibit 6, page 15.
[210] Exhibit 15B, page 1.
[211] Exhibit 4, page 237.
[212] Exhibit 5, page 51. Exhibit 6, page 14.
[213] Exhibit 15C, page 19.
[214] Exhibit 4, page 238.
[215] Exhibit 5, page 51. Exhibit 6, page 14.
[216] Exhibit 15C, page 19.
[217] Exhibit 2, page 21.
[218] Exhibit 4, page 238.
[219] Exhibit 6, page 14.
[220] Exhibit 15D, page 21.
[221] Exhibit 1, page 18.

balance of $$1300.[222] Link provided 10 years of bank statements.[223] In fact, the balance as of the bankruptcy filing was $0.[224]

8) Grand Bank 7112(K-Link). Debtor testified at his 341 exam[225] and deposition[226] that this account was open at the time of the bankruptcy but it had no money.[227] Link provided almost 15 years of bank statements.[228]  On April 16, 2021, the trustee acknowledged receipt of these Grand Bank statements.[229]  The balance as of the bankruptcy filing was $19.77.[230]

9) Regent Bank 0682 (Knightsbridge Partners).  Link disclosed his indirect ownership of Knightsbridge Partners.[231] Debtor testified at his deposition he was a signor on the business checking account.[232]  Debtor disclosed on his amended schedules he was signor on this business checking account.[233]

10) Fidelity account 2610 (Foundation).[234]  This account had a balance of $1.31 as of the bankruptcy filing.[235]

11) Fidelity account 9176 (Tucker Link Trust).[236]  This account had a balance of $.01 as of the bankruptcy filing.[237]

---

[222] Exhibit 2, page 21.
[223] Exhibit 5, page 51 (10 years).  Exhibit 6, page 14 (5 years).
[224] Exhibit 15D, page 21.
[225] Exhibit 2, pages 48, 64..
[226] Exhibit 4, page 238.
[227] Exhibit 4, page 238.
[228] Exhibit 5, page 51. Exhibit 6, page 14.
[229] Exhibit 6, page 14.
[230] Exhibit 21D, balance as of 3/1/2021.
[231] Exhibit 1, pages 15, 18.
[232] Exhibit 3, page 34.
[233] Exhibit 1, page 82.
[234] This account was not complained of in Count 3 of UST's complaint.  But it is addressed because it is an exhibit and Link was asked about it at trial
[235] Exhibit 19B.
[236] This account was not complained of in Count 3 of UST's complaint.  But it is addressed because it is an exhibit and Link was asked about it at trial
[237] Exhibit 19C.

12) Fidelity account 2601 (Knightsbridge-Link).[238] This account had a balance of $.01 as of the bankruptcy filing.[239]

i.   Sources of Income for 2019, 2020 and 2021 YTD. Debtors provided Link's 3 year income in the Statement of Financial Affairs.[240]  Link testified his income from 2020 through 2021 was from Knightsbridge Partners.[241]  The UST has provided no evidence that Debtor transferred money from March 5, 2020 until Mach 5, 2021 (within 1 years of the bankruptcy filing), or after, to hinder, delay or conceal property from creditors.  Debtors disclosed their income.

II.   <u>Failure to produce records.</u>

11 USC 727(a)(3) provides:

**(a)** The court shall grant the debtor a discharge, unless—

**(3)** the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

To sustain a claim under § 727(a)(3), the plaintiff must show that the debtor "failed to maintain and preserve adequate records and that the failure made it *impossible* to ascertain his financial condition and *material business* transactions."[242]  "If the creditor makes such a showing, the burden then shifts to the debtor to justify his or her failure to maintain the records….Records need not be so complete that they state in detail all or substantially all of the transactions taking place in the course of the business. It

---

[238] This account was not complained of in Count 3 of UST's complaint.  But it is addressed because it is an exhibit and Link was asked about it at trial
[239] Exhibit 19D.
[240] Exhibit 1, page 44.
[241] Exhibit 2, page 45.
[242] In re Bryan, 612 B.R. 618, 624–25 (Bankr. N.D. Okla. 2020)(emphasis original).

is enough if they sufficiently identify the transactions that intelligent inquiry can be made respecting

them."[243]

      Some factors that a court may consider:

a. If the debtor was involved in business, then the level of complexity and volume of the business.
b. The total amount of debt owed by the debtor.
c. Was the debtor's failure to maintain proper books and records resulted from their own negligence or fault?
d. The debtor's level of education, business experience, and knowledge.
e. The record-keeping practices customary in the debtor's specific business.
f. The extent of any egregious behavior by the debtor.
g. The demeanor of the debtor during court proceedings.[244]

 "The decision as to whether the books and records provided are sufficient is to be made on a case-by-

case basis, and is a matter left to the discretion of the bankruptcy court. Some courts have held that the

bankruptcy court has the discretion to allow the entry of a discharge even if grounds for its denial are

found."[245]

      Oral explanations can be used for explanation of records and not every transaction must be

corroborated by independent documentation.[246] The Tenth Circuit has further explained that "

'[r]ecords need not be so complete that they state in detail all or substantially all of the transactions

taking place in the course of the business. It is enough if they sufficiently identify the transaction that

intelligent inquiry can be made respecting them .' "[247] The discharge exception in 727(a)(3) has also

been applied differently to debtors depending on their status and sophistication.

      Written documents are not required for every explanation sought.  It is enough if there are

enough documents available so that intelligent inquiry can be made about the transactions.[248]  A

---

[243] Id.
[244] Id.
[245] Id.
[246] In re Spitko, 357 B.R. 272, 323 (Bankr. E.D. Pa. 2006).
[247] In re Butler, 04-27637, 2006 WL 4846385, at *2 (Bankr. D. Utah Mar. 24, 2006)
[248] Id at *3.

sophisticated businessperson might have to have scrupulous records of profit and loss in her business while an ordinary consumer might not have kept any but the most rudimentary records. A debtor's failure to maintain records must "be justified under all of the circumstances."[249]

UST complains that Debtors concealed, destroyed or did not keep/preserve records in these ways.[250]

    a. Individual Tax Returns for 2016, 2017, 2018, 2019 and 2020.  Debtors provided records of *every* financial transaction for themselves and their businesses from 2016 until 2020. Although Debtors have not yet filed tax returns for those tax years, Link testified that he knew of the filing requirement but he needed the IRS to respond to the amended tax returns for 2008, 2012 and 2014 to accurately report the proper *taxable* income for those tax years.[251]

        Even so, the court can know the sources of Debtors' income from 2016 through 2020. Link testified Knox Marine/KL Marine sold the yacht Kokomolink in 2016 which netted about $270,000 for Debtors to use.[252]  The sale proceeds were deposited into a Regent Bank account and the subsequent money transfers were shown on the bank statements.[253]  Link testified he lived off of the sale of the Bocox Family Partnership for the next couple of year.[254]  Link sold his Southern Hills Country Club membership in 2019 for $11,500[255] and then sold some art, piano and other household items.[256]  Link testified that Guggenlink and

[249] In re Amphone, 613 B.R. 764, 778 (Bankr. D. Kan. 2020).
[250] Pre-trial Order, page 23.
[251] Exhibit 2, pages 38. Transcript at 79.
[252] Exhibit 2, page 72.
[253] Exhibit 155, page 1.
[254] Exhibit 2, page 44.  Exhibit 3, page 77.
[255] Exhibit 2, page 81.
[256] Exhibit 1, page 48.

Kiamichilink paid for their real estate housing expenses[257]  Debtor began working for

Knightsbrige Partners in 2019 and received monthly consulting income thereafter. [258]

b.  Funds Received from sale of Oil and Gas business and how those funds were spent.   Please

see discussion below regarding Plaintiffs' claims alleged under §727(a)(5).  Debtors

documented where all funds were spent, through an IRS audit, through bank statements and

through discovery responses.  Plaintiffs have not identified what documents it believes to be

missing to understand something about Debtor's financial condition.

c.  Financial Transactions from the Foundation.  Debtors provided a lot of bank statements for

the Foundation's activities that ends years before the bankruptcy filing, and the IRS

subpoenaed the bank records.[259]  A master spreadsheet showed all income and expense

transactions[260] and loan documents associated with many transactions.[261]  The UST has not

identified which Foundation documents it is missing needed to understand the Foundation's

financial transactions.

d.  Sources of income from 2019, 2020 and 2021, including all 1099s, W2s, K-1s and payment

advices.  See discussion above in subsection a.

e.  Sale of Ranch documents.  Debtors explained how and when the Ranch was bought and

sold[262], for how much, and provided bank records[263] and closing statements for the 2 closing

transactions.[264]  The UST has not identified which KiamichiLink documents it is missing

needed to understand the Ranch's financial transactions.

---

[257] Transcript at 83, 192. Exhibit 107, pages 29, 37 for example.
[258] Transcript 67.
[259] Exhibit 268.
[260] Exhibit 175.  The spreadsheet includes every bank account.  Transcript at 377.
[261] Exhibits 152, 153, 154.
[262] Exhibit 2, page 17-20.  See also Exhibit 1, page 52.  Exhibit 4, pages 229-232. Exhibit 3, page 28.
[263] Exhibit 5, page 51. Exhibits 144, 147 and 150.
[264] Exhibits 12, 145, 148, and 149.

f.  Proceeds received and spent by Ms. Link from the Bocox Family Partnership.  Debtors disclosed Ms. Link received $113,000 from the sale of her family's farm[265] and provided the mineral deed whereby the family partnership transferred the remaining mineral rights.[266]  Mr. Link testified the proceeds were put into several cashier's checks.[267]  The cashier's checks were then put into Guggenlink and KiamichiLink as needed to fund business operations.[268]  Of the $113,000 in proceeds, Link could track where the cashier's checks were deposited because he would place "VSL" on the deposit slips.[269]  The Links produced bank statements showing where the cashier's checks were deposited, including $12,689 on March 2, 2020 into Knightsbridge Partners,[270] $25,000 on July 12, 2019[271], $25,000 on July 26, 2019[272] and $10,000 on October 1, 2019[273] into KiamichiLink, $25,000 on July 30, 2019[274] and $37,782.87 on August 26, 2019[275] into Guggenlink.  These deposits total $135,471.87 but some of the money was loaned to the companies and there are refunds to Vicki Link totaling $16,689.91[276] from Knightsbridge Partners, making the net amount totaling $116,781.96.

Debtors tried to provide all documents requested by the bankruptcy trustee, the IRS and the UST. The document submissions were substantial and include:

---

[265] Exhibit 2, page 44.
[266] Exhibit 11.
[267] Transcript at 132-133. Exhibit 3, page 75.  Exhibit 4, pages 215.
[268] Exhibit 4, 217.
[269] Transcript at 392.
[270] Exhibit 17C, page 1; also Exhibit 113.
[271] Exhibit 104, page 36.
[272] Exhibit 104, page 36.
[273] Exhibit 104, page 36.
[274] Exhibit 140, page 2.
[275] Exhibit 107, page 43.
[276] Exhibit 17E, page 23 ($4,000, $3000 and 1689.20).  Exhibit 107, page 44 ($10,000).

- All available financial statements, balance sheets, income statements and loans for all businesses[277]

- Bank statements[278]

III.    False Oath

11 USC 727(a)(4) provides:
(a) The court shall grant the debtor a discharge, unless—

(4) the debtor knowingly and fraudulently, in or in connection with the case—
(A) made a false oath or account;
(B) presented or used a false claim;
(C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or
(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

Section 727(a)(4)(A) of the Bankruptcy Code permits a court to deny a debtor's Chapter 7

discharge where the "debtor knowingly and fraudulently, in or in connection with the case—made a

false oath or account."[279]  To succeed on a § 727(a)(4)(A) action, a creditor must prove

1) that a debtor knowingly and fraudulently
2) made a false oath
3) related to a material fact.

A material fact is a fact that "bears a relationship to the bankrupt's business transactions or estate, or

concerns the discovery of assets, business dealings, or the existence and disposition of his property."[280]

---

[277] Transcript at 255-256.  Exhibits 209, 212, 218, 219, 232, 226, 227, 229, 230, 231, 232, 234, 235, 236, 237, 238, 239, 241, 242, 244, 245, 252, 253, 254, 254, 255, 256, 257, 267, 268, 279, 280, 281, 282 and 283.
[278] Exhibits 5 and 6 have lists of bank statements provided.  See also Exhibits 15A, 15B, 15C and 15D,
[279] 11 U.S.C. § 727(a)(4)(A).
[280] *In re Webb*, 2019 WL 2895000, at *7 (quoting *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984)).

"The fundamental purpose of § 727(a)(4)(A) is to ensure that the trustee and creditors have accurate information without having to conduct costly investigations."[281]

Plaintiffs complain that Debtors made the following false oaths[282]:

a.  At Link's 341 meeting, he testified that "We built schools in Columbia and Venezuela. We fed kids in Egypt and fed kids in South America and we provided health care to those kids with some, with the proceeds out of that Foundation."[283]   At his deposition[284] and at trial, Link corrected his testimony by stating that HOCOL, a subsidiary to KIL[285] did business in Columbia and Venezuela and built schools in those countries, not the Foundation.[286]  Vicki Link testified in her 2004 exam that the purpose of the Foundation was for the children.[287]

b.  Mr. Link falsely testified "Neither Vicki nor I have any W-2 or 1099 income during those years [2016 through 2020]."[288]  Mr. Link testified at trial the 341 testimony was true, because any income from Knightsbridge Partner would be disclosed in the form of a K-1 instead of a W-2 or 1099.[289]

c.  In their original bankruptcy schedules, Debtors stated there were no transfers in their March 4, 2021 Statement of Financial Affairs question 19 asking if Debtors transferred property to a self-settled trust or similar device within 10 years of the bankruptcy filing.[290]  The Plaintiff's complaint seems to originate from the fact that F&M Bank paid the Foundation $4.3M in

---

[281] *Id.* at *6 (quoting *Davis v. Weddington (In re Weddington)*, 457 B.R. 102, 113 (Bankr. D. Kan. 2011)).
[282] In addition to the following, Plaintiff argue that the Links knowingly and fraudulently omitted assets from their bankruptcy filings.  Pretrial Order, page 23 ¶1.  This statement is vague and counsel believes it covers the items already described below.
[283] Pretrial Order, page 24, ¶8 and ¶9(a). See Exhibit 2, page 31.
[284] Exhibit 4, page 194.
[285] Transcript at 45.
[286] Transcript at 44, 148.
[287] Exhibit 3, page 211.
[288] Pretrial Order, page 24. ¶9(b).  See Exhibit 2, page 38.
[289] Transcript at 130, 149.
[290] Pretrial Order, page 24, ¶5.  See Exhibit 1, page 48.

2012 when it paid off the mortgage bought from Grand Bank for the Big House.[291]   Debtor's

answer to question 19 of none is correct because the Foundation was not a self-settled trust or

similar device that Debtors owned. [292]   Further, the money paid by F&M Bank was paid to

benefit Guggenlink, a company that Debtors did not directly own, so the funds came not

from Debtors as the question asks.   Debtor testified correctly that he paid no personal money

into the Foundation.[293]   To clear any confusion and correct the UST's misinterpretation of the

question, Debtors amended the Statement of Financial Affairs question 19 on December 8,

2021.[294] Debtors may change their bankruptcy schedules under Bankruptcy Rule 1009.

d.   In their original bankruptcy schedules, Defendants valued their trusts as having a value of

$0.[295] The Plaintiffs argue this was an incorrect valuation because the Revocable Trusts had

an ownership interest in Knightsbridge-Link (which had an interest in Knightsbridge Partners

and an indirect interest in Cowboy Holdco and WP Global) and the The Children's Trusts

had an interest in Guggenlink and KiamichiLink (which had an indirect interest in KLR

Angus and KLR Genetics).   Debtors believed their valuation of $0 was correct at the time of

the bankruptcy filing, because:

   o   Knightsbridge-Link was only a holding company that conducted no business and had

       no assets.   Its value was 0.

   o   Knightsbridge Partners was a "shell" company that only provided consulting services

       based only on Debtor's (and other partners') efforts.[296]   Link testified at his 341 "The

       assets of the entity get on the elevator every evening and go home or get in the car

---

[291] Exhibit 132.
[292] Transcript at 447.
[293] Exhibit 3, page 86.
[294] Exhibit 1, page 91.
[295] Pre-trial Order, page 24, ¶6.  See Exhibit 1, page 16.
[296] Transcript at 164.  Exhibit 1, page 15.

and go home."[297] At the time of the bankruptcy filing, Knightsbridge Partners had

received no significant grant commissions and only paid the monthly consulting fees

from ADA pre-approved budget amounts.  Link testified the entity's bank account

funds were set aside for the monthly consulting salaries of himself, Michael

Carnuccio and William Walker, as well as subcontractors-- engineers, consultants and

attorneys-- involved in the grant writing processes.[298]  If the company were valued in

March 2021, it would have had no value.

o  At the time of bankruptcy filing, Cowboy Holdco only held a $1500 not-yet exercised

option to lease to the still-not-created Ardmore Airpark.  Link testified he didn't

believe it had any value at the time of his 341 testimony.[299] Link testified he didn't

believe the operating agreement was in place at the time of the bankruptcy filing.[300]

o   WP Global was organized the day before Debtors signed their bankruptcy papers, but

it was a shell company with no ownership interests because the operating agreement

was not yet signed and Link did not become registered agent until a year later.[301]   If

the company were valued in March 2021, it would have had no value.

o  The Children's Trusts had an interest in Guggenlink and KiamichiLink, but the

Guggenlink properties were foreclosed and KiamichiLink's property was sold in

2018.  The subsidiaries of KiamichiLink stopped doing business years earlier.  There

was no value to either entity when the Debtors filed bankruptcy.

---

[297] Exhibit 2, page 15.
[298] Transcript at 73.
[299] Exhibit 2, page 59.
[300] Transcript at 343.
[301] Exhibit 21A, page 23, Exhibit 26.

To clear any confusion, Debtors amended Schedule A/B to show that the trusts indirectly owned other companies; the Debtors still valued the trusts at $0.[302]  Debtors may change their bankruptcy schedules under Bankruptcy Rule 1009.

e.  In their original bankruptcy schedules, Defendants did not disclose in Statement of Financial Affairs question 27 of their interests in Knightsbridge Foundation, KLR Angus, KLR Genetics, Cowboy Holdco, LLC and WP Global, LLC.[303]  Question 27 asks for Debtor to report any businesses they own within 4 years of filing bankruptcy, or have the following connections to a business: sole proprietorship or self employed in trade, member of an LLC or LLP, partner in a partnership or owner of at least 5% voting equity security.[304]  The Debtors did not own these businesses within 4 years of the bankruptcy filing and none of the "connections" apply.  The Foundation, KLR Angus and KLR Genetics were not active businesses within 4 years of the bankruptcy filing so the discussion should end there- the Links were correct not to list those entities.  For Cowboy Holdco and WP Global, the Debtors did not own those businesses as they were owned through Knightsbrige-Link and Knightsbridge Partners which were disclosed.  Further, they were not sole proprietorships nor were the entities partnerships.  Debtors were not members of the LLCs did not hold at least 5% of the voting equity of the entities.[305] Links were also correct not to list those entities.

The Links "tried to list in their bankruptcy schedules everything [they] could possibly think of.  Or it it, if it wasn't listed, [they] probably were under the impression that it didn't have to be."[306]

---

[302] Exhibit 1, page 80.
[303] Pretrial Order, page 24, ¶7.
[304] Exhibit 1, page 50.
[305] Exhibit 9C, page 216-239, Exhibit 111 (Operating Agreement for Knightsbridge Partners), Exhibit 21A (Operating Agreement for WP Global), Exhibit 17I (Certification of Beneficial Owners of Cowboy Holdco).
[306] Transcript at 143.

IV.   <u>Failure to explain.</u>

11 USC 727(a)(5) provides:

(a) The court shall grant the debtor a discharge, unless—

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities....

For this objection, a creditor must show "that the debtor at one time owned substantial and identifiable assets that are no longer available for his creditors."[307]  The criticism must relate to a specific, tangible asset, not just a complaint as to "wasteful spending."[308]  Next, the burden shifts to the debtor to explain his disposition of the assets.[309]  A satisfactory explanation is one that "convince[s] the judge."[310]  No documentation is necessary if "the debtor's explanation is convincing and not rebutted[.]"[311]

The test for a Debtor failing to satisfactorily explain loss of assets or deficiency of assets to meet debtor's liabilities relates to credibility of offered explanation, not propriety of disposition.[312]  The court will not second guess how the proceeds were spent but whether the Debtor fairly explains where the assets went.

It is important to note that, for the purposes of a § 727(a)(5) inquiry, the court is not concerned with whether the disposition of the assets was proper under the Bankruptcy Code, but rather only whether the explanation satisfactorily describes what happened to the assets.[313]

[307] *Caterpillar, Inc. v. Gonzalez (In re Gonzalez),* 302 B.R. 745, 754–5 (Bankr.S.D.Fla.2003) (citing *In re Bryson,* 187 B.R. 939, 955 (Bankr.N.D.Ill.1995))
[308] In re Wagner, 492 B.R. 43, 59 (Bankr. D. Colo. 2013), aff'd, In re Wagner, 527 B.R. 416 (10th Cir. BAP (Colo.) 2015)
[309] *Id.*
[310] *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 619 (11th Cir.1984) (citations omitted).
[311] *D.A.N. Joint Venture v. Cacioli (In re Cacioli),* 463 F.3d 229, 238 (2d Cir.2006).
[312] In re Maletta, 159 B.R. 108 (Bkrtcy.D.Conn.1993).
[313] In re Mezvinsky, 265 B.R. 681, 690 (Bankr. E.D. Pa. 2001).

§727(a)(3) is broad enough to require documents from a Debtor <u>and</u> his company[314] but §727(a)(5) is not far-reaching to require explanations for both personal <u>and</u> company transactions.  This is because 727(a)(5) requires the Debtor to explain the loss of *his* assets.  A debtor must explain a loss of assets that are *property of the estate.* This reasoning has been summarized by several courts.

> Defendants' alleged misappropriation of these funds might form the basis of a complaint under 11 U.S.C. § 523, but because the checks were made payable to Defendants' business entity, such funds were never property of Defendants' bankruptcy estate. Defendants' failure to account for a loss of non-estate corporate assets should not serve as the basis for denial of discharge under 11 U.S.C. § 727(a)(5).[315]

> Though [the debtor] owns and operates the professional association, the accounts receivable of the professional association would indeed belong to the entity rather than [the debtor] individually." *Id.* Thus, the debtor was entitled to summary judgment on a § 727(a)(5) claim based on loss of the professional association's assets.[316]

> Chapter 7 debtor was under no obligation to explain loss of assets from his wholly owned corporation, notwithstanding that such corporate losses affected value of his stock;  debtor could be denied discharge in bankruptcy only for failing to adequately explain loss of his own property or property of estate.[317]

Section 727(a)(5) does not provide a limit for how far back in time a plaintiff may claim that a debtor cannot explain the loss of assets, but courts have held that the debtor must have had an interest in the property "not too far removed in time" from the bankruptcy filing date.[318]

    a.  Plaintiffs argue that Debtors have not explained the loss of funds from the sale of the oil and gas business.[319]

---

[314] See <u>In re Medina</u>, 653 B.R. 669, 682 (Bankr. N.D. Okla. 2023)("There is no doubt that, in determining whether to deny a debtor a discharge under § 727(a)(3), 'if corporate records are necessary to determine the debtor's financial condition, and the debtor has not kept or preserved such records, the debtor's discharge should be denied pursuant to § 727(a)(3).'")

[315] In re Standiferd, 7-00-16958 MA, 2008 WL 5273690, at *11 (Bankr. D.N.M. Dec. 17, 2008), subsequently aff'd sub nom. Standiferd v. U.S. Tr., 641 F.3d 1209 (10th Cir. 2011).

[316] In re Goodwin, 488 B.R. 799, 809 (Bankr. M.D. Ga. 2013).

[317] In re Colodner, 147 B.R. 90 (Bkrtcy.S.D.N.Y.1992).

[318] Neilson v. Laing (In re Laing), 329 B.R. 761, 773–74 (Bankr.M.D.Fla.2005); see also Hawley, 51 F.3d at 249 n.1 (11th Cir.1995) (noting that neither section 727(a)(5) nor Chalik require that a loss of assets be "within a year's time").

[319] Pre-trial Order, page 23 ¶2(a).

First, by law, Debtors don't believe they are legally required to explain the loss of business assets to the peril of their personal discharge.

Second, Debtors believe they have explained all about the oil and gas business sale and where the proceeds went, when they went through their comprehensive IRS audit.

Third, questions to be re-hashed about almost 2 decades later is too far removed to be a valid objection to discharge.

But the Links explained anyway.  To summarize, Link testified regarding the history of the purchase of the oil and gas business, and provided the Investor Agreement for KIL,[320] the Share Purchase Agreement when the oil and gas properties were sold to the French Company.[321]  Link explained that KIL received all funds[322] and that the sale netted him a 55% share totaling about $65M.[323] From the 55% share, 5% was split off to the Foundation[324] and every Foundation transaction was shown through a master spreadsheet.[325] Link testified he had to pay $14M in taxes when the funds were first received.[326]

The KIL money went to Knightsbridge Resources[327] and then was loaned[328] to Knightsbridge Biofuels and Ecogy Biofuels,[329] Guggenlink and KiamichiLink.[330]  From August 2006 until January 2013, Knightsbridge Biofuels borrowed $25,640,193.[331]  Link testified at his 2004 exam that the

---

[320] Exhibit 203.
[321] Exhibit 205.
[322] Exhibit 2, page 20.
[323] Exhibit 2, page 71-72.
[324] Exhibit 3, page 22.
[325] Exhibit 175.
[326] Exhibit 2, page 75.
[327] Exhibit 3, page 27.
[328] Exhibit 3, page 30.
[329] Exhibit 3, page 27.  Exhibit 2, pages 23-25.
[330] Exhibit 3, pages 27- 29. Exhibits 2, pages 76-78.
[331] Exhibit 154 shows loans for $100,000 (page 16), $500,000 (page 13), $3,000,000 (page 10), $2,137,500 (page 7), $1,800,000 (page 4), $4,000,000 (page 1), $500,000 (page 31), $1,599,128 (page 28), $8,211,955 (page 25), $2,241,610 (page 22), $650,000 (page 19).

biodiesel plant lost about $26M in round numbers,[332] which is remarkably consistent with the loan

totals.  From January 2007 until January 2013, KiamichiLink borrowed $33,004,000[333] and KLR Angus

borrowed $5,110,179.[334]  These companies were intended for profit but incurred losses over the years.[335]

Guggenlink bought and renovated the Big House for about $8,000,000.[336]  In addition, Link spent $12M

for the big yacht "Kokomolink"[337] and about $1.2M[338] for the small yacht "Aqualink".[339]  These

expenses total $99.2M, coupled with $15M in loan repayments and some operating income, roughly

equals $65M received by KIL and $14M received by the Foundation.  See Closing Exhibit E as a

summary exhibit (which was also used in Debtors' opening statement).

  b. Plaintiffs argue that Debtors have not explained the loss of funds from the Foundation.[340]

  Link testified about $14M was received to the Foundation.[341]  Link testified[342] that all

transactions were explained via a full spreadsheet showing where the funds were spent.[343]  There were

no funds in Bermuda.[344] The Foundation did not use checks[345] and no general ledgers were created for

the Foundation; the spreadsheet is the documentation of the Foundation.[346]  The spreadsheet was created

based on bank statements.[347]

---

[332] Exhibit 3, page 27.
[333] Exhibit 152 shows loans for $500,000 (page 34), $400,000 (page 34), $1,000,000 (page 31), $500,000 (page 28), $500,000 (page 25), $731,000 (page 22), $2,859,000 (page 16), $6,000,000 (page 19), $2,000,000 (page 13), $7,000,000 (page 10), $2,990,000 (page 4), $5,224,000 (page 7), $3,300,000 (page 1).
[334] Exhibit 153 shows loans for $371,500 (page 13), $776,000 (page 10), $1,862,268 (page 7), $1,100.411 (page 4), and $1,000,000 (page 1).
[335] Exhibit 2, page 78.
[336] Exhibit 2, page 75.
[337] Exhibit 3, 101. Exhibits 254 and 255.
[338] Exhibit 256, page 4.  880,000 Euros
[339] Exhibit 2, page 72.  Exhibits 256 and 257.  There were profits of $270k for the big yacht when sold and $500,000 for the small yacht when sold.  Exhibit 2, page 72.
[340] Pre-trial Order, page 23, ¶2(b).
[341] Exhibit 4, 188, 194.
[342] Exhibit 3, page 92.
[343] Exhibit 175.
[344] Exhibit 3, page 25.
[345] Exhibit 23A, page 3.
[346] Exhibit 4, page 196.
[347] Exhibit 4, page 198.

    c.   Plaintiffs argue that Debtors have not explained the loss of funds from Kiamichilink.[348]

Debtors explained how and when the Ranch was bought and sold[349], for how much, and provided bank records[350] and closing statements for the 2 closing transactions.[351]  The Ranch was sold in a two-part transaction, a sale with a repurchase option in 2017 and the final sale in 2018.[352]  Proceeds from the sale of the Ranch were used to make inter-company loans to Guggenlink[353], Knightsbridge Resources[354], loan repayments to L. Tucker Link Revocable Trust[355], loan payoffs to First Bank[356] and several payments to Chemicals,[357] and payments to Bermuda Commercial Bank.[358]  In circumstances, KiamichiLink provided funds for Chemicals which would have been recognized as a loan from Chemicals to KiamichiLink.[359]

    d.   Plaintiffs assert that Link did not explain the loss of assets held on December 31, 2012, [360]December 31, 2013[361] and December 31, 2014.[362]

The personal financial statements in 2012, 2013 and 2014 were made when all of Debtor's various companies were in operation, or were closing, nearly a decade before Debtor filed bankruptcy. Debtors believe they are too far removed from the bankruptcy filing to be a hindrance to Debtors'

---

[348] Pre-trial Order, page 23, ¶2(c).
[349] Exhibit 2, page 17-20.  See also Exhibit 1, page 52.  Exhibit 4, pages 229-232. Exhibit 3, page 28.
[350] Exhibit 5, page 51. Exhibits 144, 147 and 150.
[351] Exhibits 12, 145, 148, and 149.
[352] Transcript at 273.
[353] Transcript at 275, 296, 301.
[354] Transcript at 276.
[355] Transcript at 279, 281.
[356] Transcript at 282.
[357] Transcript at 286, 288-289, 297-298.
[358] Transcript at 287, 299
[359] Transcript at 190-191, 197.
[360] Pretrial Order, page 25, ¶12.  See Exhibit 162.
[361] Pretrial Order, page 25, ¶12.  See Exhibit 163.
[362] Pretrial Order, page 25, ¶11.  See Exhibit 164.

discharge.  The Statement of Financial Affairs only asks for financial statements within 2 years of the bankruptcy filing.[363]

Debtor testified that he created the personal financial statements given to Bancfirst[364] with his best guess of values of the businesses.[365]  The notes receivable were liabilities resulting from the promissory notes due to the companies.[366]  The values were given based on Link's experience and knowledge.[367]  He used the financial statements to answer the bank's questions.[368]  As stated above, the last chemicals company was sold for debt in 2019[369], Knox Marine sold its yachts[370], Knightsbridge Resources closed in 2020,[371] Guggenlink's properties were foreclosed in 2020,[372] KiamichLink sold in 2018,[373] Knightsbridge Biofuels and Ecogy Biofuels were foreclosed in 2014 and subsequently sold,[374] and all cash as indicated on the financial statements was spent.[375]

## CONCLUSION

Debtor respectfully requests that the court enter a discharge and overrule the objections to discharge filed the IRS and UST.

---

[363] Exhibit 1, page 53, question 28.
[364] Exhibit 3, pages 85- 106 (Note Deposition exhibits were marked at 62, 63 and 64 which match the trial exhibits of 162, 163 and 164.
[365] Exhibit 3, page 87, 91.
[366] Exhibit 3, page 88-89.
[367] Exhibit 3, page 97.
[368] Exhibit 3, page 99.
[369] Transcript at 263-264. Exhibit 2, page 29.
[370] Exhibit 2, page 72.  Exhibit 1, page 53.
[371] Exhibit 1, page 51.
[372] Transcript at 83.
[373] Transcript at 273.
[374] Transcript at 335.
[375] Transcript at 366.

Respectfully submitted,
Brown Law Firm PC by


 /s/  Ron Brown_____
Ron Brown, OBA # 16352
1609 E. 4th Street
Tulsa, OK 74120
(918) 585-9500
(918) 585-5266 fax
ron@ronbrownlaw.com