# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

Filed/Docketed
Nov 22, 2024

| | |
|---|---|
| IN RE:<br><br>**LOUIS TUCKER LINK and VICKIE BOCOX LINK,**<br><br>    **Debtors.** | **Case No. 21-10221-M**<br>**Chapter 7** |
| **UNITED STATES OF AMERICA,**<br><br>    **Plaintiff,**<br>v.<br><br>**LOUIS TUCKER LINK,**<br><br>    **Defendant.** | **Adv. Proc. No. 21-01026-M** |
| **ILENE J. LASHINSKY, UNITED STATES TRUSTEE,**<br><br>    **Plaintiff,**<br>v.<br><br>**LOUIS TUCKER LINK and VICKIE BOCOX LINK,**<br><br>    **Defendants.** | **Adv. Proc. No. 21-01031-M**<br><br>**(Consolidated with<br>Adv. Proc. No. 21-01026-M)** |

## MEMORANDUM OPINION

*"Ooh I love to dance a little sidestep, now they see me now they don't-*
*I've come and gone and, ooh I love to sweep around the wide step,*
*cut a little swathe and lead the people on."*[1]

---

[1] Hall, Carol, "The Sidestep," *The Best Little Whorehouse in Texas*, Original Cast Recording, MCA, 1978, LP. For a brilliant and humorous rendering of this song by Charles Durning in the 1982 movie of the same name, go to https://www.youtube.com/watch?v=AALREbJZEZk.

In the 1982 film, *The Best Little Whorehouse in Texas*, venerable character actor Charles Durning portrayed the Governor of Texas, a gifted politician with a smooth, glib, and totally empty way with words (he could also sing and dance, but that is beside the point). The Governor was noted for long-winded speeches void of substance, but chock full of promises and platitudes. One of the best lines in the movie came from a reporter after one such speech: "I hear him talking, but I can't tune him in." Every time the Governor spoke, people were left scratching their heads. It was a funny bit, and it left most audiences smiling.

What works well in the movies usually fares poorly in federal court. In this adversary proceeding, the Court heard almost two full days of testimony from one debtor, Louis Tucker Link ("Tucker Link"). The other debtor, Vickie Sue Link ("Vickie Link"), was conspicuously silent. At one point in time, the Links appear to have been fabulously wealthy; indeed, the sale of one of the Link-controlled assets generated $65 million for them personally. There was even more money and other assets (an operating ranch, three houses, and a yacht among them) accumulated over the years. The hundreds upon hundreds of questions posed to Tucker Link at trial focused on two simple topics: where did all the money and property go, and what records do you have to prove where it went. In this judge's almost 28 years on the bench, never has so much been said for so long with so little substance. The Governor would be proud.

The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052.[2]

## Jurisdiction

The Court has jurisdiction over this bankruptcy case pursuant to 28 U.S.C. § 1334(b).

---

[2] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.

Venue is proper pursuant to 28 U.S.C. § 1409. Reference to the Court of the bankruptcy case is proper pursuant to 28 U.S.C. § 157(a). The granting or denial of a discharge is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(J).

## Findings of Fact

Tucker Link and Vickie Link (collectively, the "Links") filed a voluntary petition under chapter 7 of the Bankruptcy Code (the "Petition") on March 5, 2021 (the "Petition Date").[3] The Links listed the total current value of their assets on the Petition Date to be $79,102.52, and liabilities to be $30,841,372.82.[4] The bulk of the Links' debt arises out of tax liabilities owed to the United States of America ("USA"), specifically the Internal Revenue Service (the "IRS"). Both the USA and Ilene J. Lashinsky, the United States Trustee for this region ("UST") (collectively, "Plaintiffs"), brought actions under § 727 objecting to the Links' discharge.[5] The Court held a trial in this adversary proceeding on May 13–15, 2024 (the "Trial").

### The Links

Tucker Link holds a degree in accounting from Oklahoma State University.[6] He holds a (currently inactive) designation as a Certified Public Accountant.[7] His employment history includes extensive operating and senior-management experience in the oil and gas, banking, financial services, investment banking, agriculture, and real estate industries.[8] His early career included serving as an audit division supervisor for Peat Marwick Mitchell and as President and

---

[3] Pls.' Ex. 1.

[4] *Id.* at 18, 23, 34.

[5] These actions were consolidated into Adversary Proceeding No. 21-01026-M. The USA brought an action against Tucker Link under § 727(a)(4)(A), (5) and § 523(a)(1)(C); the UST brought an action against the Links under § 727(a)(2), (3), (4)(A), and (5).

[6] Pretrial Order at ¶ II(19), ECF No. 37; Pls.' Ex. 17B, at 4.

[7] Trial Tr. 25:21-24, ECF No. 57-1; Pls.' Ex. 17B, at 4.

[8] Pretrial Order at ¶ II(18), ECF No. 37.

CEO of several banking and financial institutions.[9] He is currently working as a business consultant.[10] Vickie Link holds a degree from Oklahoma State University.[11] She was employed briefly near the beginning of their marriage but has not held a wage-earning position since the birth of the Links' children.[12] The Links have two adult children, Eric Link, and Andrea Walker, who is married to William Walker. These are the family players; as you will see, other characters take the stage in minor roles as the story unfolds.

### The Link Entities

To say the Links have created a tangled mess of financial structures that defy understanding is an understatement of epic proportions. Over the last 20 years, the Links have created a complex corporate structure made up of numerous entities, consisting of revocable trusts, intentionally defective trusts, foreign entities, and domestic limited liability companies (the "Link Entities") designed to funnel all tax obligations through the Links' individual or joint tax returns.[13] The relevant Link Entities are summarized below.

### The Trusts

In approximately 2004, the Links created The L. Tucker Link Revocable Trust (the "Tucker Trust") and The Vickie Sue Link Revocable Trust (the "Vickie Trust") (collectively, the "Link Trusts").[14] Tucker Link was the beneficiary of the Tucker Trust, had control over all property it

---

[9] *Id.* at ¶ II(20)-(21).

[10] Trial Tr. 14:24—15:2, ECF No. 57-1.

[11] Pretrial Order at ¶ II(22), ECF No. 37; Pls.' Ex. 3, at 174:12-17.

[12] Pls.' Ex. 3, at 174:20—175:1.

[13] The Links created several flowcharts in an attempt illustrate the corporate structure they created. *See* Pls.' Ex. 10; Closing Argument by Louis Tucker Link and Vicki [sic] Bocox Link, ECF No. 56-2 to -4 (hereinafter "Links' Closing Brief"). *See also* Pls.' Ex. 17B, at 4.

[14] Pretrial Order at ¶ II(51), ECF No. 37; Trial Tr. 55:16-21, ECF No. 57-1; Pls.' Ex. 4, at 60:13-23, 63:13—64:3.

held, and served as its trustee.[15] From 2004 until an IRS levy in 2017 (discussed *infra*), the Links used the Link Trusts' bank accounts as their personal bank accounts.[16] Between 2004 and 2017, the Links' ownership interests in their multiple business entities were held through the Link Trusts. Some statements for the Tucker Trust were provided; no statements for the Vickie Trust were produced to Plaintiffs or this Court.[17]

In 2006, the Links also created four grantor trusts for their children (the "Children's Trusts").[18] Like the Link Trusts, the Children's Trusts were used to hold the ownership interests in the Links' multiple business entities. Robert A. Scott ("Scott") was a long-time friend and business associate of Tucker Link. From 2006 until his resignation in July 2020, Scott served as trustee of each of the Children's Trusts, as well as COO or manager of several entities owned by the Children's Trusts.[19]

### The International Operations

#### a. Knightsbridge Investment Limited ("K-Investment")

In 2001, Tucker Link was hired as a consultant by Nimir Petroleum Global Group ("Nimir"); six months later he was Nimir's COO.[20] During his employment with Nimir, Tucker Link orchestrated the formation of K-Investment as an "exempted company" under the laws of Bermuda.[21] The Links owned a majority share of K-Investment, and Tucker Link was its CEO and chairman of its board of directors.[22] Under Tucker Link's managerial control, K-Investment

---

[15] Pretrial Order at ¶ II(52)-(54), ECF No. 37.
[16] Trial Tr. 189:6-12, ECF No. 57-1. *See infra* text accompanying note 81.
[17] Pls.' Ex. 4, at 95:25—96:7; Pls.' Ex. 6, at 13-15.
[18] *See* Pls.' Exs. 116—118.
[19] Pls.' Ex. 33, at 41:8, 66:13—67:18; Pretrial Order at ¶ II(57), (63), (68), (69), ECF No. 37.
[20] Pretrial Order at ¶ II(23)-(24), ECF No. 37.
[21] *Id.* at ¶ II(25); Defs.' Ex. 236, at 2.
[22] Pretrial Order at ¶ II(27), (29)-(30), ECF No. 37; Trial Tr. 13:10-12, ECF No. 57-1.

bought out Nimir.[23] Between 2004 and 2006, K-Investment sold its oil-and-gas operations for $460 million.[24] After selling their personal interest in K-Investment's oil-and-gas operations, the Links received $65 million after taxes (the "Proceeds") which was deposited into accounts held by the Link Trusts and a related Link Entity called Knightsbridge-Link, LLC, discussed *infra*.[25] After the sale of the oil-and-gas operations, K-Investment, then entirely owned by the Links or their controlled Entities, continued to own and operate a chemicals business ("K-Chemicals"), with subsidiaries in several countries that were sold off in 2009 (Pakistan), 2012 (UAE), and 2019 (Egypt).[26]

### b. Knightsbridge Foundation ("K-Foundation")

Around July 2004, the Links arranged for K-Foundation to be created as a "charitable trust" under the laws of Bermuda, with both of the Links serving as trustees at various times.[27] The stated charitable purpose of K-Foundation was to provide schools and educational facilities in foreign countries where their oil-gas-and-chemical companies operated.[28] Through a series of inter-company transactions, K-Foundation received over $17 million from a sale of K-Investment shares (the "K-Foundation Funds").[29] At all relevant times, the Links had exclusive control over the assets of K-Foundation, including exclusive signatory authority over its accounts.[30] There is no evidence any K-Foundation Funds were ever used for the charitable purposes for which it was created; the funds were mainly used, through unrealized loans and gifts, to finance the Links' other business

---

[23] *Id.* at ¶ II(26).
[24] *Id.* at ¶ II(31). K-Investment maintained its interest in its chemical operations.
[25] *Id*. at ¶ II(34); Trial Tr. 42:2-4, ECF No. 57-1. *See infra* text accompanying notes 40-41.
[26] Pls.' Ex. 10, at 1; Pls.' Ex. 179; Pls.' Ex. 3, at 20:17-18; Trial Tr. at 265:13-266:14, ECF No. 57-1.
[27] Pretrial Order at ¶ II(35), (41)-(42), ECF No. 37.
[28] *Id.* at ¶ II(39).
[29] *Id.* at ¶ II(48).
[30] *Id.* at ¶ II(41)-(43).

operations.[31] K-Foundation stopped operating between 2013 and 2015, when it ran out of funds.[32] It was eventually closed by its charter bank around 2019.[33] The Links provided bank statements for K-Foundation, as well as a spreadsheet prepared by their accountant, showing intercompany transfers among several Link Entities (the "K-Foundation Spreadsheet").[34] Tucker Link testified that the K-Foundation Spreadsheet was not created as a business record, but was based solely on K-Foundation's bank statements.[35] No financial records were kept beyond the K-Foundation Spreadsheet and its underlying bank statements.[36] No balance sheets or income statements were ever prepared for K-Foundation.[37]

### c. Knox Marine Ltd. ("Knox") / KL Marine LLC ("KL Marine")

Knox was an entity owned by K-Investment that was established to purchase and acquire a custom built 30-meter yacht, the KokomoLink (the "Yacht"), for the Links' personal use. The Yacht was commissioned in 2009 and purchased for over $11 million. At some point thereafter the Yacht was transferred to KL Marine, an entity owned in equal shares by each of the Links.[38] The disposition of the Yacht is addressed *infra*.[39]

---

[31] Defs.' Ex. 239, at 5 ("Beginning in 2009 and continuing through 2014, entities owned directly or indirectly by the [Debtors] received loans from [K-Foundation]. While portions of those loans were repaid, pursuant to the promissory notes, considerable amounts were not repaid, resulting in the reporting of forgiveness of indebtedness income by the entities (which then flowed through to the [Debtors]).").

[32] Trial Tr. 206:1-5, ECF No. 57-1; Pls.' Ex. 4, at 135:5-17.

[33] Links' Closing Brief, at 6.

[34] Pls.' Ex. 175; Trial Tr. 375:18-25, ECF No. 57-1.

[35] Trial Tr. 376:1-3, ECF No. 57-1.

[36] *Id.* at 377:23-25.

[37] Pretrial Order at ¶ II(44), ECF No. 37.

[38] Trial Tr. at 318:15-21, ECF No. 57-1.

[39] *See infra* text accompanying notes 97 – 103.

***The U.S. Operations***

    *a.  Knightsbridge-Link, LLC ("K-Link")*

K-Link is a Delaware LLC formed in 2005, whose ownership is held collectively by the Link Trusts and the Children's Trusts.[40] Tucker Link is the manager of K-Link.[41] K-Link has been described as "an investment company for [Tucker Link], [Vickie Link] and children for US activities."[42] K-Link shares ownership of K-Investment with the Links. The Links used the Proceeds and K-Link to finance their other foreign and domestic business ventures.

    *b.  Knightsbridge Resources, LLC ("K-Resources")*

K-Resources is a Delaware LLC formed in 2003 to be a U.S.-based holding company for the Proceeds and the Links' U.S. business operations.[43] It is owned by the Tucker Trust and the Children's Trusts.[44] Scott was its COO between 2007 and 2020.[45] According to Tucker Link, "it didn't make anything or produce anything or manufacture anything, but it was basically a holding company."[46] The Links used K-Resources to fund their U.S.-based business activities, including two failed biofuel entities, KiamichiLink, LLC (a ranching enterprise), and GuggenLink, LLC (a real estate venture), each discussed *infra*. Between January 1, 2010 and January 1, 2013, K-Resources received more than $16 million from K-Foundation as loans.[47] No evidence was presented that these funds were ever repaid. All other funding came from the Links personally or from the Proceeds.[48]

---

[40] Pretrial Order at ¶ II(93)-(94), ECF No. 37.
[41] Pls.' Ex. 9, at 6:19-23.
[42] Pls.' Ex. 17B, at 4.
[43] Pretrial Order at ¶ II(59), ECF No. 37; Pls'. Ex. 3, at 27:4–28:9.
[44] Pretrial Order at ¶ II(60), ECF No. 37.
[45] *Id.* at ¶ II(58).
[46] *Id.* at ¶ II(61); Pls.' Ex. 3, at 27:4–28:9.
[47] Pls.' Ex. 33, at 56:9—57:16.
[48] Pls.' Ex. 3, at 27:4—29:21.

### c.   KiamichiLink, LLC ("KiamichiLink")

KiamichiLink is a Delaware LLC owned by the Children's Trusts.[49] It was created to purchase and operate an 11,700-acre cattle ranching operation (the "Ranch") in rural Oklahoma. The Ranch was "set up as an intentionally defective trust for tax purposes for the benefit of the heirs."[50] The Links paid nearly $10 million to purchase the Ranch in 2007.[51] The purchase was funded by some vague combination of K-Resources's funds, loans from K-Foundation, and the Proceeds.[52] At all relevant times, Tucker Link served as KiamichiLink's manager and Scott served as its COO.[53] The decision to purchase the Ranch in the name of the Children's Trusts was made by the Links who "always had the dream of owning a ranch;" Scott, as trustee of the Children's Trusts, played no role in the decision.[54] The Links lived part-time on the Ranch. Between 2006 and 2021, the Links used KiamichiLink bank accounts to pay their personal expenses.[55] No financial records for KiamichiLink were maintained or disclosed other than bank statements and promissory notes documenting intercompany transfers. Tucker Link controlled KiamichiLink's assets at all times.[56]

### d.   GuggenLink, LLC ("GuggenLink")

 GuggenLink is a Delaware LLC formed in 2005 and owned by the Children's Trusts.[57] GuggenLink was formed for the purpose of owning and managing the Links' three residential properties in Oklahoma. It was "set up as an intentionally defective trust for tax purposes for the

---

[49] Pretrial Order at ¶ II(62)-(63), ECF No. 37.
[50] Pls.' Ex. 17B, at 4.
[51] Pls.' Ex. 3, at 28:18—29:6.
[52] *Id.* at 29:4-21; Trial Tr. 60:15-24, ECF No. 57-1.
[53] Pretrial Order at ¶ II(63), ECF No. 37.
[54] Trial Tr. 64:20—65:5, ECF No. 57-1.
[55] Pretrial Order at ¶ II(64), ECF No. 37.
[56] *Id.* at ¶ II(109).
[57] *Id.* at ¶ II(67), (72).

benefit of the heirs."[58] In 2005, GuggenLink purchased a \$3.3 million home adjacent to the Southern Hills Country Club in Tulsa, Oklahoma (the "Southern Hills Property").[59] According to Tucker Link, the Links spent an additional \$3.5 to \$4 million on renovations to the Southern Hills Property.[60] In 2010, GuggenLink purchased a home in Jenks, Oklahoma for \$590,000 (the "South Nandina Property").[61] In 2012, GuggenLink purchased a third residential property from William Walker (the "Granite Court Property").[62] Between 2006 and June 2017, Tucker Link served as GuggenLink's manager and Scott served as its COO.[63] After an IRS levy in June 2017, discussed *infra*, the two switched roles.[64] Scott made clear that, although he retained signatory authority on its bank accounts, GuggenLink was "not a typical corporate structure," and Tucker Link retained the day-to-day operational control of the business for all relevant time periods.[65] Since 2016, Tucker Link has been responsible for keeping all books and records of GuggenLink.

Despite the fact that the three residential properties owned by GuggenLink were ostensibly purchased for the benefit of the Children's Trusts, the Links benefited personally from their use. The Links lived in the Southern Hills Property from its acquisition in 2005 until October 2018.[66] The Links purported to "lease" the Southern Hills Property from GuggenLink for \$20,000 per month, exclusive of utilities.[67] During 2010 and 2011 (years for which GuggenLink tax returns are available), GuggenLink received no rent payments from the Links.[68] Further, GuggenLink bank

---

[58] Pls.' Ex. 17B, at 4.
[59] Pretrial Order at ¶ II(74), ECF No. 37.
[60] Trial Tr. 52:7-9, ECF No. 57-1.
[61] Pls.' Ex. 126; Pretrial Order at ¶ II(81), ECF No. 37.
[62] Pretrial Order at ¶ II(88), ECF No. 37.
[63] *Id.* at ¶ II(68), (70).
[64] *Id.* at ¶ II(69), (71). *See infra* text accompanying notes 81.
[65] Pls.' Ex. 33, at 87-89.
[66] Pretrial Order at ¶ II(75), ECF No. 37.
[67] *Id.* at ¶ II(77).
[68] *Id.* at ¶ II(79).

accounts were used to pay the Links' personal expenses.[69] Tucker Link characterized these expenditures as "operating expenses" of GuggenLink.[70]

   *e. Knightsbridge Partners, LLC ("K-Partners")*

   K-Partners is an Oklahoma LLC formed in December 2019.[71] Ownership of K-Partners is split between K-Link (50%) and William Walker and JTK Investments (50%).[72] In his schedules, Tucker Link characterized K-Partners as a "[s]hell entity used for consulting business."[73] K-Partners's primary business is to provide consulting services towards the development of an airpark in Ardmore, Oklahoma. Tucker Link is the manager of K-Partners and performs its consulting services.[74] As of the Petition Date, he was being paid $7,500 per month for that work.[75] His earnings flow through K-Link before being paid to him.[76] Neither K-Link nor K-Partners have issued Tucker Link a 1099 in connection with the Ardmore contract.[77] A 2020 Schedule K-1 issued from K-Partners to K-Link shows self-employment earnings of $21,635, but does not otherwise connect this amount to Tucker Link.[78] Tucker Link is responsible for keeping K-Partners's books and records and controls its bank accounts.[79]

### *The IRS Audit and Levy*

   Between 2012 and 2015, the IRS conducted an audit of the Links' joint tax returns for tax years 2004 through 2012 (the "Audit"). In conjunction with the Links' tax audit, the IRS also

---

[69] *Id.* at ¶ II(92).
[70] Trial Tr. 191:22—192:17, ECF No. 57-1.
[71] Pls.' Ex. 111.
[72] Pls.' Ex. 3, at 31:14-23.
[73] Pls.' Ex. 1, at 15.
[74] Pls.' Ex. 111, at 9.
[75] Pls.' Ex. 1, at 38-39.
[76] Trial Tr. 129:2-11, ECF No. 57-1.
[77] *Id.* at 129:19—130:5.
[78] Pls.' Ex. 14.
[79] Pls.' Ex. 32, at 99:8-13, 119:11–121:18.

initiated a tax audit of K-Foundation. At the conclusion of the Audit, the Links were assessed penalties for tax years 2008 and 2012, of at least $971,018.93 and $1,288,441.28 respectively, based largely on the operation of K-Foundation.[80] The Links have filed amended returns for those years and continue to dispute the assessed penalties; those disputes remain pending as of this decision.

On July 30, 2017, the IRS issued a levy to collect $2,788,679.92 related to Tucker Link's individual tax liabilities for years 2008 and 2012 (the "Levy").[81] The Levy resulted in the attachment of funds from four separate bank accounts controlled by Tucker Link, including the Tucker Trust.[82] In short order, Tucker Link acted to remove his signatory authority from all other business bank accounts, including those held by K-Resources, K-Link, GuggenLink, and KiamichiLink.[83] In addition, he acted to juggle his role in each of the companies to appoint others, including William Walker and Scott, as persons with nominal control, and remove both himself and Vickie Link from those positions.[84] Tucker Link admits that these changes were made as a direct result of the Levy, and more importantly, that the changes did not affect his ability to control and move money between the Link Entities.[85]

***Liquidation Mode***

The apex of the Links' business empire was the receipt of the Proceeds from the sale of their interest in K-Investment in 2004-2006. In a financial statement provided to Regent Bank, the Links represented their net worth to be approximately $61.7 million at the end of 2014; between

---

[80] Pls.' Ex. 177.

[81] *Id.*

[82] *Id.*; Trial Tr. 289:25—290:2, ECF No. 57-1. It is unclear how much the IRS recovered as a result of the Levy.

[83] Trial Tr. 290:3—293:20, ECF No. 57-1 ("I think all of them were changed.").

[84] *Id.* at 290—295.

[85] *Id.* at 294:23–295:3.

$28.5 million and $34.4 million at the end of 2015; and $22.5 million as of December 31, 2016.[86] In a later statement to Regent Bank, they revised their December 31, 2016, net worth to be $20.0 million. By the end of 2017, their net worth had fallen to $7.4 million; by June 30, 2018, it had inched up to $7.5 million.[87] Their reported assets as of June 30, 2018, included real property held by GuggenLink and K-Investment, as well as other "business investments" and "tax refunds." Liabilities included loans between banks and various Link Entities, but did not include any intercompany indebtedness.[88]

Prior to 2016, the Links employed Cindy Fitzgerald ("Fitzgerald") as a bookkeeper for many of the domestic Links Entities, including KiamichiLink, GuggenLink, K-Resources, K-Link, and the biofuel companies.[89] During her tenure, some basic books and records were maintained, and individual tax returns were prepared and submitted on behalf of the Links. After Fitzgerald left the Links' employ in 2016, Tucker Link assumed all accounting and bookkeeping responsibilities for the Link Entities.[90] Tucker Link stated that he "kept track of the cash receipts and disbursements" of these entities, but did not otherwise keep any financial records beyond bank statements and promissory notes.[91]

---

[86] Pls.' Ex. 17A, at 3.

[87] Pls.' Ex. 17B, at 6.

[88] *Id.*

[89] Trial Tr. 258:1-16, ECF No. 57-1.

[90] *Id.* at 183:5-13.

[91] Q: [Nathan Baney, counsel for Department of Justice, Tax Division] And so [Fitzgerald] left in 2016. Isn't it true that after she left you these domestic operations stopped keeping financial statements?

A: [Tucker Link] They didn't prepare financial statements, but they kept track of the cash receipts and disbursements.

Q: Okay. So there's no -- from 2016 forward, there's no balance sheets available for these companies?

A: Correct.

Q: There's no income statements?

A: Correct.

After the Levy, the Links suffered several business setbacks. As a result, the Links went "into a liquidation mode to try to protect what [they] could and save what [they] could."[92] This included efforts to sell the Southern Hills Property, which were hampered by a lien placed on the house by the IRS as part of the Levy; the property was eventually liquidated through foreclosure in August 2020. The Links sold the Ranch in a two-part transaction in May 2017 and March 2018,[93] and received approximately $3.2 million as a result of those sales.[94] These funds were deposited in KiamichiLink's bank accounts and then siphoned off as loans or the repayment of loans to the Tucker Trust, the Links' children, and other Link Entities.[95] The only corroboration of these transfers is bank statements and Tucker Link's oral testimony.[96]

---

> Q: Cashflow statements?
> A: Cashflow statements, yes.
> Q: General ledgers?
> A: No.
> Q: None, none of those things for any of the domestic companies?
> A: Correct.

*Id.* at 258:17-259:8.

[92] *Id.* at 366:10-13.

[93] Pls.' Ex. 12.

[94] Pls.' Ex. 145 ($1,773,330.65 in 2017); Pls.' Exs. 148, 149 ($1,518,203.75 in 2018).

[95] Trial Tr. 83:25—84:10; 274—289, ECF No. 57-1. A non-exhaustive list of withdrawals include:

> $40,000, Intercompany loan to GuggenLink;
> $200,000, Intercompany loan to K-Resources; $250,000 (same);
> $53,000, Repayment of loan to Tucker Trust; $75,000 (same);
> $160,226, Repayment of loan to First Bank;
> $59,153.13, Repayment of loan to Andrea and William Walker;
> $27,500, Intercompany loan to K-Investment in Egypt; $25,500 (same);
> $82,000, Transfer to K-Chemicals (Dubai);
> $97,585, Intercompany loan to K-Investment, transferred to Bermuda Commercial Bank for "services;"
> $13,500, Intercompany loan to K-Chemicals, transferred to Eric Link to cover shortfall in salary; $38,500 (same); $82,000 (same); $18,000 (same). *See* Pls.' Ex. 146.

[96] Trial Tr. 274—289, ECF No. 57-1.

In 2016, the Links sold the Yacht for approximately $2.2 million.[97] No documents were provided showing the disposition of these proceeds.[98] A bank statement of KL Marine, designated as "Interest Reserve Account" dated February 16 – 29, 2016, shows an initial balance of zero, and an ending balance of $66,053.57.[99] Over the course of a single week, between February 17 – 23, 2016, over $400,000 flowed through the KL Marine account. Multiple deposits were made, all without description. Most funds were removed by wire transfer. Some funds went to unrelated individuals and marine-related entities. Other transfers went to various Link Entities: $35,000 to KiamichiLink on February 18, 2016; $65,000 to KiamichiLink on February 22, 2016; $75,000 to K-Chemicals (UAE) on February 23, 2016; $97,000 to K-Chemicals (Egypt) on February 23, 2016.[100] Tucker Link testified that of the total Yacht proceeds, roughly $300,000 went towards expenses and closing costs, and $1.6 million was used to pay a loan to Regent Bank.[101] At other times he testified that the Links used proceeds from the Yacht sale to support their lifestyle.[102] A financial statement provided by the Links in February 2017 to Regent Bank indicated the Yacht generated $3.5 million in cash flow to the Links, but did not show any corresponding debt related to the Yacht.[103]

### Documents provided by the Links

The Links provided bank statements from many personal, corporate, and trust bank accounts.[104] In addition, the Links claim to have submitted "all available financial statements,

---

[97] *Id.* at 320:15-20.
[98] *Id.* at 319:10—320:6.
[99] Pls.' Ex. 155, at 1
[100] *Id.* at 2-3.
[101] Trial Tr. 320:17-20, ECF No. 57-1.
[102] *Id.* at 395:4-7.
[103] Pls.' Ex. 17A, at 3.
[104] *See* Pls.' Ex. 5, at 49-52; Pls.' Ex. 6, at 13-15.

balance sheets, income statements and loans for all businesses" to Plaintiffs and the case trustee.[105]

The documents relied on by the Links and admitted at Trial include:

    a.  July 2013 response to an IRS request for information regarding intercompany loans.[106]
    b.  2015 federal partnership income tax return for K-Resources.[107]
    c.  2010-12, various financial documents for K-Resources.[108]
    d.  2010 federal partnership income tax return for GuggenLink.[109]
    e.  2011 federal partnership income tax return for GuggenLink.[110]
    f.  2015 Oklahoma partnership income tax return for GuggenLink.[111]
    g.  Links' response to IRS draft form 4564.[112]
    h.  Letter of protest and appeal of certain IRS tax penalties, dated November 22, 2016.[113]
    i.  2013 amended federal income tax return for the Links.[114]
    j.  2014 amended federal income tax return for the Links.[115]
    k.  2008 amended federal income tax return for the Links.[116]
    l.  2012 amended federal income tax return for the Links.[117]
    m.  2007 federal income tax return for the Links.[118]
    n.  2012 federal income tax return for the Links.[119]
    o.  2009 federal income tax return for the Links.[120]

The admitted exhibits contained no "financial statements, balance sheets, income statements [or]

loans." Exhibit No. 222 was described as financial documents for K-Resources regarding its

---

[105] *See* Links' Closing Brief, ECF No. 56, at 28 & n.277.

[106] Defs.' Ex. 209. The attached file shows transfers in and out of K-Investment without detail or explanation. The attachment does not appear responsive to the information requested.

[107] Defs.' Ex. 218.

[108] Defs.' Ex. 222.

[109] Defs.' Ex. 230.

[110] Defs.' Ex. 231.

[111] Defs.' Ex. 232.

[112] Defs.' Ex. 236. The undated response is a narrative provided by the Links without documentation or exhibits. It appears to have been drafted in response to a meeting with the IRS on May 17, 2016.

[113] Defs.' Ex. 239. The letter is drafted by William Chevaillier, the Links' tax counsel, and provides a written narrative without attachments or documentation.

[114] Defs.' Ex. 252.

[115] Defs.' Ex. 253.

[116] Defs.' Ex. 279.

[117] Defs.' Ex. 280.

[118] Defs.' Ex. 281.

[119] Defs.' Ex. 282.

[120] Defs.' Ex. 283.

activities in 2010 that were provided to the IRS in response to the Audit.[121] Exhibit No. 222 appears to be a compendium of banking transactions from numerous accounts associated with K-Resources, with very little notation or explanation of the purpose of each transaction. It also contains some records from 2011 and 2012, although the purpose or significance of those documents was not made clear to the Court. In addition to the referenced documents, a single Schedule K-1 from K-Partners to K-Link issued in 2020 was provided.[122]

Neither of the Links have filed individual federal income tax returns (Form 1040) for tax years 2016 through 2022.[123] While they acknowledge their legal obligation to file annual returns, the Links advance several reasons why they have not done so. Primarily, they blame the delay on the IRS, stating that they are awaiting resolution of their pending disputes and amended tax returns before filing additional individual or joint returns.[124] In addition, Tucker Link has stated that neither he nor Vickie Link generated W-2 or 1099 income during those years, although he acknowledges that they will show K-1 income.[125] This includes income in 2020 to Tucker Link based on his consulting work on the Ardmore project for K-Partners and K-Link. The Links also acknowledge that the business accounts of GuggenLink and KiamichiLink have long been used to pay their personal expenses.[126] No accounting of these personal expenses is available other than bank statements.

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

---

[121] Trial Tr. 383:22—384:6, ECF No. 57-1.
[122] Pls.' Ex. 14.
[123] Pretrial Order at ¶ II(111), ECF No. 37.
[124] Trial Tr. 394:10-13, ECF No. 57-1.
[125] *Id.* at 394:24—395:3.
[126] *Id.* at 395:9-15; Pretrial Order at ¶ II(64), (92), (108), ECF No. 37.

## Burden of Proof

The Court will address the Plaintiffs' claim to deny the Links a discharge pursuant to

§ 727(a)(3) and (5) of the Bankruptcy Code. To prevail under these sections, the Plaintiffs must

prove each statutory element by a preponderance of the evidence.[127] As the Bankruptcy Appellate

Panel for the Tenth Circuit has held,

> A prima facie case under § 727(a)(3) requires a showing that a debtor "failed to
> maintain and preserve adequate records and that the failure made it *impossible* to
> ascertain his [or her] financial condition and *material* business transactions." If a
> creditor or trustee meets this initial burden, "the burden then shifts to the debtor to
> justify his or her failure to maintain the records." A party objecting to a debtor's
> discharge under § 727(a)(5) has the burden of proving facts establishing that a loss
> of assets occurred. The burden then shifts to the debtor to explain the loss of assets
> in a satisfactory manner. The ultimate burden under § 727 rests with the plaintiff
> and must be proven by a preponderance of the evidence.[128]

To further the policy of providing a debtor with a "fresh start," "the Bankruptcy Code must be

construed liberally in favor of the debtor and strictly against the creditor."[129] Even so, "a discharge

in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest

debtor."[130] To obtain the benefit of a discharge, a debtor that voluntarily submits themself to the

jurisdiction of the bankruptcy court incurs certain obligations imposed by the Bankruptcy Code.[131]

One such duty is the complete transparency of one's financial condition "in order to preserve the

goal of 'fair dealing' between the debtor and creditors."[132] "If a debtor cannot tell [their] trustee

---

[127] Fed. R. Bankr. P. 4005. *See also Grogan v. Garner*, 498 U.S. 279 (1991): *First Nat'l Bank v. Serafini (In re Serafini)*, 938 F.2d 1156, 1157 (10th Cir. 1991).

[128] *Martinez v. Sears (In re Sears)*, 565 B.R. 184, 189 (10th Cir. BAP 2017) (footnotes omitted).

[129] *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997).

[130] *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996).

[131] *See e.g.*, § 521; *Beach v. Morris (In re Beach)*, 281 B.R. 917, 921 (10th Cir. BAP 2002).

[132] *United States v. Ellis*, 50 F.3d 419, 424 (7th Cir. 1995) (citing *G & J Invs. v. Zell (In re Zell)*, 108 B.R. 615, 627 (Bankr. S.D. Ohio 1989)).

or creditors what happened to [their] money, or provide records to show where the money went, and a party in interest objects, [they do] not get a discharge."[133]

<strong>Conclusions of Law</strong>

***Section 727(a)(3)***

Section 727(a)(3) provides that

> The court shall grant the debtor a discharge, unless—
>
> . . . .
>
> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.][134]

This Court has previously held that "[t]he decision as to whether the books and records provided are sufficient is to be made on a case-by-case basis, and is a matter left to the discretion of the bankruptcy court."[135] A party seeking to deny the debtor a discharge under § 727(a)(3) need not prove fraud or the intent to conceal assets.[136] *Martinez v. Sears (In re Sears)* provides the Court with valuable guidance:

> "The scope of the debtor's duty to maintain records depends on the nature of the debtor's business and the facts and circumstances of each case." When a debtor carries on a business involving substantial assets, "greater and better record keeping" is warranted. Other circuit courts and bankruptcy courts hold that records are inadequate where the debtor failed to separate personal and business accounts, failed to substantiate expenses, or failed to explain dispositions of cash.[137]

---

[133] *In re Sears*, 565 B.R. at 187.

[134] § 727(a)(3).

[135] *Okla. DHS v. Bryan (In re Bryan)*, 612 B.R. 618, 625 (Bankr. N.D. Okla. 2020); *Lashinsky v. Medina (In re Medina),* 653 B.R. 669, 680 (Bankr. N.D. Okla. 2023).

[136] *Solis v. Asif (In re Asif)*, 455 B.R. 768, 790 (Bankr. D. Kan. 2011).

[137] 565 B.R. 184, 189-90 (10th Cir. BAP 2017) (footnotes omitted) (quoting *Bailey v. Ogden (In re Ogden)*, No. UT-98- 042, 251 B.R. 441, 1999 WL 282732, at *6 (10th Cir. BAP Apr. 30, 1999) (unpublished opinion) (§ 727(a)(3) inquiry is fact specific)). *See also Caneva v. Sun Cmtys. Operating Ltd. P'ship (In re Caneva)*, 550 F.3d 755, 762 (9th Cir. 2008) (greater duty to

19

In this circuit, denial of discharge under § 727(a)(3) requires proof of the failure to maintain adequate records and proof that the failure makes it "*impossible* to ascertain [a debtor's] financial condition and *material business* transactions."[138] Where an individual's business and personal finances are intertwined, a debtor's disclosure duty may extend to records of closely held businesses, in addition to personal records.[139] This is more than a simple requirement to turn over

---

keep records where debtor is engaged in substantial business); *Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 900 (7th Cir. 2002) ("Where debtors are sophisticated in business, and carry on a business involving significant assets, creditors have an expectation of greater and better record keeping." (quoting *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 970 (7th Cir. 1999))); *In re Juzwiak*, 89 F.3d at 428 (checking account ledgers, canceled checks, bank statements, and income tax returns were insufficient to reconstruct a debtor's financial condition without the source of funds and substantiation of expenses when personal and business expenses were commingled); *Bavely v. Daniels (In re Daniels)*, 641 B.R. 165, 184 (Bankr. S.D. Ohio 2022) ("Courts typically place a higher burden of recordkeeping on debtors who operate businesses."); *Varco Pruden Bldgs. v. Strider (In re Kennington)*, 393 B.R. 430 (Bankr. N.D. Miss. 2008) (failure to maintain distinction between company finances and personal finances, using corporate funds to pay personal expenses, and failing to maintain corporate books making it impossible to verify business dealings resulted in inadequate financial records); *Wachovia Bank, N.A. v. Spitko (In re Spitko)*, 357 B.R. 272, 306 (Bankr. E.D. Pa. 2006) ("Where the debtor is engaged in numerous business transactions (as is the instance here), the failure to keep or produce any records regarding those transactions may be treated as a violation of § 727(a)(3)."); *Sterling Int'l, Inc. v. Thomas (In re Thomas)*, 01-21302, 2003 WL 21981707, at *10 (Bankr. D. Idaho July 17, 2003) ("[A] debtor engaged in business may justly be expected to maintain more detailed and comprehensive records than a consumer not engaged in business.").

[138] *In re Brown*, 108 F.3d at 1295 (citation omitted).

[139] *Lee v. Peeples (In re Peeples)*, 779 Fed. App'x 561, 566 (10th Cir. 2019) ("[I]f corporate records are necessary to determine the debtor's financial condition, and the debtor has not kept or preserved such records, the debtor's discharge should be denied pursuant to § 727(a)(3)." (quoting *In re Asif*, 455 B.R. at 791)); *In re Asif*, 455 B.R. at 793 ("The failure to keep business records in this case directly impaired the Trustee's ability to do her job, and for the creditors of the estate to determine Debtor's financial transactions."); *In re Medina*, 653 B.R. at 682; *Connors*, 283 F.3d at 900 ("[C]onsidering the significance of the business entities to the [debtors'] bankruptcy, as well as the intertwining of personal and business expenses, we find that the [debtors'] business transactions cannot be fully ascertained without further tracing of the loan proceeds [between and among debtors and their closely held businesses]"); *In re Daniels*, 641 B.R. at 184–85 ("Indeed, numerous courts have held that to satisfy his disclosure obligations under § 727(a)(3), a debtor may be required to provide not only his own records but also records from closely-held businesses."); *O'Hearn v. Gormally (In re Gormally)*, 550 B.R. 27, 49 (Bankr. S.D.N.Y. 2016) ("[A]lthough [Section] 727(a)(3) focuses on records relating to the debtor's personal financial

any records the debtor has on hand; the statute "places *an affirmative duty* on the debtor to create books and records which accurately document the debtor's business affairs."[140] That duty cannot be shifted onto creditors or the Court.[141] "[U]nder appropriate circumstances a debtor may be denied a discharge based on his failure to keep, maintain or preserve records belonging to a separate, but closely held corporate entity."[142]

---

affairs, his failure to keep adequate financial records regarding the business transactions of a closely held corporation that are necessary to determine his personal financial affairs may result in the denial of a discharge." (quoting *Stillwater Liquidating LLC v. Gray (In re Gray)*, 14-11851, 2016 WL 1039559, at *3 (Bankr. S.D.N.Y. Mar. 15, 2016))); *Jou v. Adalian (In re Adalian)*, 500 B.R. 402, 408 (Bankr. M.D. Pa. 2013); *Gray v. Jackson (In re Jackson)*, 453 B.R. 789, 797–98 (Bankr. E.D. Pa. 2011); *In re Spitko*, 357 B.R. 307 (Noting that some "courts have concluded that the preservation of corporate records can be germane to denial of discharge in those instances where the financial condition of the individual debtor and the corporation are closely connected."); *MoSex Exhibit 1, LLC v. Campbell* (*In re Campbell*), 19-00042, 2021 WL 4517424 (Bankr. D.D.C. Sept. 30, 2021).

[140] *In re Connors*, 273 B.R. 764, 770 (S.D. Ill. 2001) (citing *In re Scott*, 172 F.3d at 969), *aff'd sub nom. Union Planters Bank, N.A. v. Connors*, 283 F.3d 896 (7th Cir. 2002). *See also Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 355 (4th Cir. 2007) ("We are content with the principle that a bankruptcy debtor is not required to maintain perfect records. A debtor is, however, *obliged by the statute* to preserve sufficient and adequate financial records to enable the court and the parties to reasonably ascertain an accurate picture of his financial affairs." (emphasis added)); *In re Daniels*, 641 B.R. at 183 ("In other words, 'adequate record-keeping [is] a predicate for a debtor's discharge.'" (quoting *Agai v. Antoniou (In re Antoniou)*, 527 B.R. 71, 78 (Bankr. E.D.N.Y. 2015))).

[141] *Connors*, 283 F.3d at 899 ("[N]either the court nor a creditor is required to reconstruct a debtor's financial situation by sifting through a morass of checks and bank statements."). *See also In re Juzwiak*, 89 F.3d at 428; *PNC Bank, N.A. v. Leongas (In re Leongas)*, 628 B.R. 71, 104 (Bankr. N.D. Ill. 2021).

[142] *Blanchard v. Ross (In re Ross)*, 97-19956, 1999 WL 10019, at *4 (Bankr. E.D. Pa. Jan. 4, 1999). *See also In re Asif*, 455 B.R. at 792 ("[I]f corporate records are necessary to determine the debtor's financial condition, and the debtor has not kept or preserved such records, the debtor's discharge should be denied pursuant to § 727(a)(3)." (internal quotation marks omitted)); *In re Thomas*, 2003 WL 21981707, at *11 ("This Court agrees with *Ross* that, in situations where the facts indicate that a debtor exercised control over and conducted business through a closely held corporation, § 727(a)(3) inquiries cannot be artificially limited to those records that are, strictly speaking, those of the debtors."); *In re Womble*, 289 B.R. 836, 857 (Bankr. N.D. Tex. 2003) ("Second, those courts that have considered section 727(a)(3) in the context of a debtor who owns or controls closely held entities, have concluded that the debtor's failure to keep adequate records for such entities, as well as of the debtor's business dealings with such entities, may constitute a violation of section 727(a)(3)."), *aff'd sub nom. Womble v. Pher Partners*, 299 B.R. 810 (N.D.

Records provided by a debtor need not be flawless, but they must "sufficiently identify the transactions that intelligent inquiry can be made respecting them."[143] The nature and scope of records that must be maintained depends on the nature of the debtor's business and the facts and circumstances of each case.[144] Courts ask "whether there [is] available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained."[145] It is fundamentally a question of reasonableness in the particular circumstances.[146] "[T]he Court's final determination must be made in light of the purpose of § 727(a)(3), which is to preserve its goal of fair dealing by making a

---

Tex. 2003), *aff'd*, 108 Fed. App'x 993 (5th Cir. 2004); *In re Daniels*, 641 B.R. at 188 ("Someone like the Debtor who 'pays personal expenses out of business accounts, . . . pays business expenses out of a personal account, or . . . pays one entity's expenses out of an account belonging to a different entity' must keep records that adequately identify the reason for and source of the payment. *Womble*, 289 B.R. at 857–58.").

[143] *Hedges v. Bushnell*, 106 F.2d 979, 982 (10th Cir. 1939), *cited with approval in The Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 615 (10th Cir. BAP 2001), *aff'd*, 35 F. App'x 811 (10th Cir. 2002). *See also Henkel v. Green (In re Green)*, 268 B.R. 628, 647 (Bankr. M.D. Fla. 2001).

[144] *In re Sears*, 565 B.R. at 189-90 (citing *In re Ogden*, 1999 WL 282732, at *6); *In re Bryan*, 612 B.R. at 625; *Womble v. Pher Partners (In re Womble)*, 108 Fed. App'x 993, 996 (5th Cir. 2004).

[145] *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992) (internal citation omitted). *See also In re Peeples*, 779 Fed. App'x at 566-67 (citing *In re Asif*, 455 B.R. at 791); *In re French*, 499 F.3d at 355; *In re Juzwiak*, 89 F.3d at 427; *Cox v. Lansdowne (In re Cox)*, 904 F.2d 1399, 1402 (9th Cir. 1990); *In re Underhill*, 82 F.2d 258, 259–60 (2d Cir. 1936); *Peters v. Michael (In re Michael)*, 433 B.R. 214, 221 (Bankr. N.D. Ohio 2010) ("Old records are often destroyed. With this reality, § 727(a)(3) does not impose upon a debtor an obligation to keep and preserve financial records forever. Instead, § 727(a)(3) only imposes upon a debtor a duty to keep and preserve financial records for a reasonable period of time, with two years having been used as a *minimum* point of reference." (emphasis added)); *Crocker v. Stiff (In re Stiff)*, 512 B.R. 893, 898 (Bankr. E.D. Ky. 2014) ("Section 727(a)(3) does not contain a statute of limitations, and the courts that have written of a two-year look-back period have all been careful to provide that such a period is not a hard-and-fast rule, and only applies, if at all, in the ordinary consumer case.").

[146] *In re Underhill*, 82 F.2d at 259–60. *See also In re French*, 499 F.3d at 345; *In re Gray*, 2016 WL 1039559, at *4.

debtor's right to discharge dependent on his ability to account, *via* written record, for his financial condition."[147] As one court has noted,

> The purpose of § 727(a)(3) is "'to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs.'" *Cox v. Lansdowne (In re Cox)*, 904 F.2d 1399, 1401 (9th Cir. 1990) (quoting *In re Underhill*, 82 F.2d 258, 260 (2d Cir. 1936)). This statute "ensures that trustees and creditors will receive sufficient information to enable them to 'trace the debtor's financial history; to ascertain the debtor's financial condition; and to reconstruct the debtor's financial transactions.'" *Juzwiak*, 89 F.3d at 427–28 (citation omitted). In the absence of § 727(a)(3), debtors without proper books and records could obtain a discharge while frustrating a trustee's ability to liquidate prepetition assets to satisfy prepetition debts. "Creditors are not required to risk the withholding or concealment of assets by the bankrupt under cover of a chaotic or incomplete set of books or records." *Cox,* 904 F.2d at 1401 (quoting *Burchett v. Myers,* 202 F.2d 920, 926 (9th Cir. 1953)).[148]

Having set the stage, let us raise the curtain and begin.

### Plaintiffs have established a prima facie case under § 727(a)(3)

The Court has no trouble concluding Plaintiffs have established their prima facie case under § 727(a)(3) that the Links have "failed to keep or preserve" books or records "from which [their] financial condition or business transactions might be ascertained."[149] The Links, together or separately, whether directly or through layers of corporate entities, owned the controlling interest in each of the Link Entities. They used the Link Entities, primarily GuggenLink and KiamichiLink, to finance a lavish lifestyle in the years before the Petition Date, all the while avoiding the receipt of income that could be reportable to the IRS via forms W-2 or 1099.

Plaintiffs put particular focus on the Links' failure to file tax returns for themselves or any of the Link Entities between 2016 and 2020. In addition, the Links have failed to provide ordinary business records for any entity for this time period, such as income and cash flow statements or

---

[147] *In re Zell*, 108 B.R. at 627.
[148] *In re Scott*, 172 F.3d at 969.
[149] § 727(a)(3).

balance sheets, i.e., the supporting documents needed to file tax returns. Courts have noted that "[i]ncome tax returns are *quintessential documents* 'from which the debtor's financial condition or business transactions might be ascertained.'"[150] They are commonly used by the trustee to "verify the schedules filed by debtors, to find property that may be improperly scheduled or not scheduled at all, to determine tax liability, and to determine whether refunds are forthcoming."[151] Several courts have recognized that tax returns, standing alone, are neither necessary,[152] nor sufficient[153] to satisfy a debtor's obligations under § 727(a)(3). While each case rests on its own facts, given the extensive business operations, large intercompany loans and transfers, and general intermingling of the Links' personal and business affairs, income tax returns are the *minimum* that

---

[150] *Nisselson v. Wolfson (In re Wolfson)*, 152 B.R. 830, 833 (S.D.N.Y. 1993) (emphasis added).

[151] *Lubman v. Hall (In re Hall)*, 174 B.R. 210, 215 (Bankr. E.D. Va. 1994). *See also In re Beach*, 281 B.R. at 921 ("The Debtors' Returns are *imperative* to allow the Trustee to assess what portion, if any, of the Debtors' tax refunds are property of the estate and to collect and administer the refunds in accordance with the Bankruptcy Code." (emphasis added)).

[152] *McDow v. Korfonta (In re Korfonta)*, 08-16675, 2009 WL 4571852, at *3 (Bankr. E.D. Va. Dec. 2, 2009) ("Quite frankly, the court is doubtful that a failure to file tax returns, without more, constitutes grounds for denial of discharge under § 727(a)(3)."); *In re Gray*, 2016 WL 1039559, at *5 ("[T]he failure to file tax returns, standing alone, may be insufficient to bar a discharge under Bankruptcy Code § 727(a)(3)[.]"); *In re Spitko*, 357 B.R. at 310 ("Although some courts suggest that the failure to file personal income tax returns, without cause, is alone sufficient to deny a debtor a discharge, . . . Congress most likely intended that such failure is a factor under section 727(a)(3), but not determinative." (citations omitted)).

[153] *In re Juzwiak*, 89 F.3d at 428 ("Many courts faced with checking account records, canceled checks, deposit slips, bank statements, *and tax returns* as the sole documentation of a debtor's financial history and condition have determined that such records are inadequate under § 727(a)(3)." (citing cases) (emphasis added)); *Turoczy Bonding Co. v. Strbac (In re Strbac)*, 235 B.R. 880, 884 (6th Cir. BAP 1999) ("However, § 727(a)(3) is not restricted to a debtor's tax returns, but instead encompasses any records that the debtor can produce to enable the trustee and creditors to obtain a complete and accurate view of the debtor's financial circumstances."); *Strzesynski v. Devaul (In re Devaul)*, 318 B.R. 824, 836 (Bankr. N.D. Ohio 2004) ("As other courts have held, income tax returns are generally an important, although not necessarily sufficient, . . . , indicator of a debtor's financial condition." (citation omitted)); *The Cadle Co. v. Jacobowitz (In re Jacobowitz)*, 296 B.R. 666 (Bankr. S.D.N.Y. 2003) (tax returns not sufficient to satisfy § 727(a)(3) where they lacked indicia of veracity and debtor testified they were based on estimates and guesses), *aff'd,* 309 B.R. 429 (S.D.N.Y. 2004).

this Court expects to be kept and disclosed in a case such as this.[154] In the absence of regularly filed tax returns, the Court expects sufficient financial records and written documentation from which those returns could be prepared. Neither the returns nor their underlying source documents are present here.

After the departure of Fitzgerald in 2016, Tucker Link testified that he served as the accountant and bookkeeper for most of the Link Entities. For the five years preceding the Petition Date, he kept no books, records, basic financial statements, or other documentation beyond general ledgers and bank statements for those entities. He provided no reason or explanation for the paucity of records kept during that time. The absence of corporate records makes it impossible for the Plaintiffs and the Court to understand the various loans, financial dealings, and intercompany transfers between and among the various Link Entities. The Links suggest that the various loans, payments, and transactions among the Link Entities were documented in those entities' bank statements. This answer ignores their duty, as voluntary debtors, to provide organized and coherent

---

[154] *In re Hall*, 174 B.R. at 214 ("Given the income, property and other items scheduled by the Halls, the returns requested by the trustee are, at a minimum, what must be kept and disclosed by the debtors in this case."); *In re Womble*, 289 B.R. at 858 ("[A] debtor's failure to file timely tax returns—especially for several years in a row—is a blatant example of a failure to maintain adequate records."); *In re Daniels*, 641 B.R. at 186 ("Courts have accordingly held that a debtor's failure to file tax returns can amount to a violation of § 727(a)(3). . . .This is especially true when, as here, the debtor has failed to file tax returns for himself or his businesses for several years in a row." (citations omitted)); *In re Adalian*, 500 B.R. at 407 ("A debtor's failure to timely file tax returns—especially for several years in a row—is a blatant example of a failure to maintain adequate records.").

This case is factually distinct from *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290 (10th Cir. 1997), where the debtor owned a car collection operated as hobby, not a business entered into for profit, and the court found that cash sales were commonplace in that hobby. *Id*. at 1295. In that case, the court found the debtor's obligation to keep records was minimal in the circumstances. Similarly, in *Lashinsky v. Amphone (In re Amphone),* 613 B.R. 764 (Bankr. D. Kan. 2020), the court held the debtor to a lower standard of record keeping in a consumer case where debtor's primary debts resulted from gambling.

books and records from which their financial condition can be ascertained.[155] Neither the Plaintiffs nor the Court are required to undertake the burden of reconstructing the Links' financial affairs.[156]

In response to the Plaintiffs request for books and records, the Links have provided copies of personal income tax returns or amendments for tax years 2007-09 and 2012-14; federal partnership income tax returns for GuggenLink for tax years 2010-11 and K-Resources for tax year 2015; a general ledger for K-Resources for 2010; various financial documents for K-Resources for 2011 and 2012; and an Oklahoma partnership income tax return for GuggenLink for tax year 2015. None of those records cover the period within five years of the Petition Date. The Links provided various letters and other correspondence with the IRS regarding the Audit, which included narrative explanations of various business transactions. Lastly, the Links provided several years of bank statements for multiple personal, trust, and corporate bank accounts. No effort was made to summarize or organize the information in a way that Plaintiffs or the Court could use to digest and understand the underlying financial condition of the Links individually or any of the trust or business entities.

Even where the Links made an effort to organize information from bank statements, such as the K-Foundation Spreadsheet, their efforts fell woefully short of the mark. The K-Foundation Spreadsheet, which purported to summarize many of the intercompany transactions between the Link Entities between 2006 and 2014, was created from bank statements by the Links' accountant

---

[155] *Connors*, 283 F.3d at 899 ("It is the debtor's duty to maintain and provide the court with organized records of its financial dealings.").

[156] *Id.* ("[Debtors] borrowed, lent, transferred, and spent extremely large sums of money to keep these businesses afloat. Providing the court with a stack of cancelled checks and deposit account statements simply does not meet their burden under § 727; it does not give [creditor] sufficient information to trace their financial history or to reconstruct their transactions."). *See also In re Leongas,* 628 B.R. at 104 ("Neither the court nor creditors have an obligation to 'reconstruct a debtor's financial situation,' nor are they required, 'in the absence of adequate records, to take a debtor's word for his financial dealings[.]'" (citations omitted)).

in response to the Audit.[157] It appears to be nothing more than a compendium of bank transactions organized by month. Plaintiffs point out that several of the transactions summarized in the K-Foundation Spreadsheet are inconsistent with or cannot be verified from the original bank statements. Such a self-generated summary, which does not purport to adhere to any general accounting standards, leaves the Court with no confidence that it accurately portrays the financial condition of the underlying business entity. Neither does it serve to provide the Plaintiffs relevant information regarding the Links' financial condition within a reasonable period preceding the Petition Date.

The Court concludes that Plaintiffs have met their initial burden to show that the Links failed to keep adequate books and records for themselves and their closely held entities, leaving the Plaintiffs and the Court with a head scratching tangle of intercompany transactions which make it *impossible* to understand the Links' true financial condition.[158] Although they had no duty to do so, it appears both Plaintiffs spent tremendous time and effort to untie the financial knot created by the Links. Despite the Plaintiffs' best efforts, the Links' true financial condition remains shrouded in mystery.

***The Links' justifications***

Once a plaintiff makes its prima facie showing that debtors have failed to maintain books

---

[157] Pls.' Ex. 175.

[158] This case is remarkably similar to *In re Womble*, where the court noted:

> [Debtor] presented the court with spaghetti—numerous transactions going in all directions, all intertwined between [Debtor and his closely held corporate entities] with no meaningful paper trail, and with nothing more than [Debtor's] after-the-fact explanation of what any particular transaction or transfer represented. The Code demands more of a debtor in [Debtor's] circumstance[.]

289 B.R. at 859.

and records, the burden shifts to the debtor to show their action or inaction was "justified under all of the circumstances of the case."[159] Factors that a court may take into account when determining the sufficiency of disclosures include:

1. Whether the debtor was engaged in business, and if so, the complexity and volume of the business;
2. The amount of the debtor's obligations;
3. Whether the debtor's failure to keep or preserve books and records was due to the debtor's fault;
4. The debtor's education, business experience and sophistication;
5. The customary business practices for record keeping in the debtor's type of business;
6. The degree of accuracy disclosed by the debtor's existing books and records;
7. The extent of any egregious conduct on the debtor's part; and
8. The debtor's courtroom demeanor.[160]

The balance of these factors weighs against granting a discharge to the Links. The majority of the debt for which the Links seek a discharge is tax and business debt.[161] Using a mix of foreign limited companies, revocable and defective trusts, and domestic limited liability companies, the Links orchestrated a complex corporate structure to hold and conduct all of their business and personal activities and expenditures over (at least) the last decade. Several millions of dollars have flowed through the Link Entities, at the Links' direction, in the recent past, resulting in over $2 million in unsecured debt on the Petition Date. At times it felt like the complexity of the Links' business empire was strategic: by maintaining an air of confusion about their financial condition, the Links hoped to escape any consequences of full disclosure.

The Links rest on three primary lines of justification for their failure to keep or maintain adequate records. First, they claim they were hindered from, or advised against, filing additional tax returns after 2015 due to the failure of the IRS to resolve their previous amendments and

---

[159] § 727(a)(3).
[160] *State Bank of India v. Sethi (In re Sethi)*, 250 B.R. 831, 838 (Bankr. E.D.N.Y. 2000).
[161] Pls.' Ex. 1, at 6 (Official Form 101, Q16).

settlement offers.[162] Second, Tucker Link testified that neither he nor Vickie Link received any income documented by Forms W-2 or 1099 after 2015.[163] Lastly, in a dramatic flourish, the Links hint that they are in possession of the necessary documents to compete all unfiled tax returns within the next 30 to 45 days, but are at the mercy of their accountant.[164]

The Links cite no statutes, case law, or administrative guidance to support a theory that delay by the IRS related to a prior years' tax obligation would relieve a taxpayer of their obligation to file annual returns going forward. Despite their purported lack of reportable income, Tucker Link has admitted that the Links have a reporting obligation to file tax returns for each year from 2016 to 2020.[165] He noted that "the tax returns for those years will simply be the winding down of the businesses of the LLCs and the closure of those businesses and any losses that might be generated."[166] Just as importantly, although not acknowledged by Tucker Link, the returns will show how much of the assets of the various Link Entities were diverted to the Links' personal use.[167] Due to the complex nature of the corporate structure created by the Links, and the flow-through nature of the Link Entities, the Links' individual or joint returns are required to be filed whether or not they generated income from wages or other distributions. The suggestion that the Links believe otherwise is farcical.

Tucker Link has had a long career as a CPA and then financial consultant; the Court finds him to be a well-educated, experienced, and sophisticated businessperson. Vickie Link did not testify at Trial; we know little about her business acumen other than she holds a college degree. At

---

[162] Pls.' Ex. 2, at 38:6-9; Pls.' Ex. 3, at 129:3-8; Trial Tr. 394:10-13, ECF No. 57-1.

[163] Pls.' Ex. 2, at 38:6-11; Pls.' Ex. 3, at 129:3-8; Trial Tr. 394:24—395:1, ECF No. 57-1.

[164] Pls.' Ex. 5, at 9 (response to interrogatory 16); Trial Tr. 394:14-19, ECF No. 57-1.

[165] Pls.' Ex. 2, at 38:1-4.

[166] *Id.* at 38:15-17.

[167] This, of course, assumes the returns themselves present an accurate reflection of the Links' financial condition and intercompany dealings.

least on paper, both Tucker and Vickie Link appear to have shared ownership and control of many of the Link Entities. Tucker and Vickie Link collectively owned 100% of K-Investment after 2009; Vickie Link was a trustee of K-Foundation after August 2006, and had signatory authority and control over its bank accounts and assets; she was a grantor of some of the Children's Trusts; she was a 50% owner of KL Marine; and the Vickie Trust held 46.5% of K-Link, which was later transferred to Vickie Link individually. Given her level of ownership, control, and signatory authority over substantial portions of the Links' business operations, the Court finds that Vickie Link was not an unsophisticated bystander with respect to the Link Entities, but was sufficiently involved to be held responsible for keeping and maintaining books and records for those entities under her control. The Court will not presume her to be ignorant of the Links' business affairs simply because she did not testify at Trial.

Given the complexity of the Links' business arrangements, the significant intercompany transfers, and their relative sophistication, it is reasonable to expect fairly thorough and comprehensive recordkeeping from these debtors, including individual or joint tax returns and basic corporate financial statements for the Link Entities. The Links purposely crafted the Link Entities into a complex corporate structure to hold title and/or ownership of business entities, real estate, personal property, and other valuable assets like the Yacht. The Links used the Link Entities to comingle personal and business expenditures in ways that have effectively hidden their financial condition from view without detailed records and tax documents. Such a complex business structure may offer benefits, such as tax relief and limitation of liability, but, in bankruptcy court, it also comes with a cost: its business activities and intercompany transactions must be documented in a manner designed to inform and educate the trustee and parties-in-interest regarding the true financial condition of the entities and their principals. A debtor cannot be the architect of a complex

business operation and then hide behind that complexity to justify failure to keep sufficient books and records that would make its inner-workings transparent to all parties.

Despite the complexity of the business arrangements, Tucker Link testified that he did not maintain or keep books and records, beyond bank statements, for any of the Link Entities during the five years before the Petition Date. Instead, the Links offer a mountain of bank statements, which allegedly show every transaction by and among the Link Entities. The Court has no confidence that the unorganized reams of bank statements provided by the Links give it, the trustee, or the Plaintiffs "a true presentation of the debtor's financial affairs."[168] Courts have overwhelmingly found that a "document dump" consisting of unorganized bank statements does not satisfy the requirements of § 727(a)(3).[169] Debtor's affirmative duty to keep books and records includes the duty to present the information in an organized way that creditors and the Court can gain a meaningful understanding of the Debtor's financial condition.[170] Similarly, oral

---

[168] *In re Underhill*, 82 F.2d at 260.

[169] *In re Womble*, 289 B.R. at 858 ("It is not a defense that the debtor submitted for inspection such items as cancelled checks, receipts, and banking account statements, when a creditor would not be able to ascertain the debtor's true financial condition from such documents without time consuming and detailed analysis."); *Connors*, 283 F.3d at 899; *In re Scott,* 172 F.3d at 970; *In re Juzwiak,* 89 F.3d at 428–29; *Hughes v. Lieberman (In re Hughes),* 873 F.2d 262, 264 (11th Cir. 1989) ("We emphasize that [debtor] may not simply place tow sacks of records before the bankruptcy judge and request the judge to sift through the documents and attempt to reconstruct the flow of the debtor's assets."); *Yeaton v. Weisenburg (In re Yeaton),* 457 F.2d 803, 803–04 (9th Cir. 1972) ("stacks of canceled checks, escrow statements, diaries, expense listings, and other miscellaneous papers furnished by [debtor] were inadequate to ascertain his financial position and business transactions."); *In re Daniels*, 641 B.R. at 187 ("[T]he Code requires more from a debtor than the proverbial document dump. The debtor should provide *organized* records of his financial affairs and business dealings."); *In re Spitko*, 357 B.R. at 309 ("The trustee or the creditors should not be required to sort through a large mound of documents to reconstruct the debtors' financial situation."); *Krohn v. Frommann (In re Frommann)*, 153 B.R. 113, 118 (Bankr. E.D.N.Y. 1993) ("The trustee should not be required to sift through voluminous scraps of paper in order to trace assets.").

[170] *In re Daniels*, 641 B.R. at 187 ("'[i]t is not a defense that the debtor submitted for inspection such items as cancelled checks, receipts, and banking account statements, when a creditor would not be able to ascertain the debtor's true financial condition from such documents

explanations are not sufficient to meet a debtor's record keeping duty under § 727(a)(3), where the circumstances of the case require more.[171] The Court concludes that the Plaintiffs have met their burden by a preponderance of the evidence, and the Links must be denied a discharge under § 727(a)(3).

While the Plaintiffs found it difficult to get a straight answer out of Tucker Link throughout the Trial, the Court was just as troubled by his assertion that the Links could, apparently at the drop of a hat, file all of the missing tax returns. On some level, the statement seemed to be part of a pattern by Tucker Link to tell the Plaintiffs (and presumably the Court), whatever he thought they wanted to hear in the moment. A darker, more concerning interpretation is that the Links envision some kind of advantage to be gained from withholding the filing of their tax returns until the conclusion of this proceeding. Whatever benefit may exist, it comes at the expense of their discharge.

### Section 727(a)(5)

Plaintiffs also ask this Court to deny the Links' discharge under § 727(a)(5). The purpose behind this section is to ensure that creditors, the trustee, and the Court are provided a clear picture of a debtor's financial transactions and activities prior to bankruptcy.[172] Section 727(a)(5) provides:

(a) The court shall grant the debtor a discharge, unless–

* * *

---

without time consuming and detailed analysis.'" (quoting *In re Womble*, 289 B.R. at 858)); *In re Spitko*, 357 B.R. at 309 ("In general, chapter 7 debtors have a duty to keep their records in an organized fashion.").

[171] *In re Spitko*, 357 B.R. at 306 ("The debtor cannot rely solely on 'unsubstantiated oral testimony' regarding his business dealings to satisfy his record-keeping requirement." (first citing *In re Juzwiak*, 89 F.3d at 429; and then citing *Clark v. Kearns (In re Kearns)*, 149 B.R. 189, 191 (Bankr. D. Kans. 1992)).

[172] *Crane v. Morris (In re Morris)*, 302 B.R. 728, 742 (Bankr. N.D. Okla. 2003).

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets or to meet the debtor's liabilities[.][173]

As one court has noted,

> Under the provisions of § 727(a)(5), a debtor will not be granted a discharge where it appears to the court that the debtor should have had the resources available to deal fairly with creditors, but is unable to explain the disposition or loss of those assets. A lack of detailed information as to the debtor's affairs prejudices creditors by making it difficult for the trustee to administer the estate and recover assets that may otherwise be recoverable for the benefit of creditors. As well, a lack of transparency creates a cloud of doubt as to the true nature of the debtor's pre-petition activities. Where the ability to maintain records and explain the loss of assets is fully within the debtor's control, it would be inequitable to grant a discharge to an individual who, by his or her own actions, with or without fraudulent intent, has made it impossible to administer the estate or determine where the debtor's assets have gone.[174]

Neither the Bankruptcy Code nor the United States Court of Appeals for the Tenth Circuit has set forth a standard for determining what constitutes a satisfactory explanation of loss of assets under § 727(a)(5). Other courts have determined that such a finding is left to the sound discretion of the court.[175] In the simplest terms, in order to be satisfactory, the explanation must be one that convinces the judge.[176] Courts have found that a debtor's explanation for a diminution of assets must be specific and corroborated.[177] More than a "vague, indefinite, and uncorroborated hodgepodge of financial transactions" must be forthcoming.[178] Courts have struggled with defining the nature and amount of corroborating evidence that must be provided in order for an

---

[173] § 727(a)(5).

[174] *McVay v. Phouminh (In re Phouminh)*, 339 B.R. 231, 247 (Bankr. D. Colo. 2005).

[175] *Baum v. Earl Millikin, Inc.*, 359 F.2d 811, 814 (7th Cir. 1966); *In re Sears*, 565 B.R. at 192 (citing *Blackwell Oil Co. v. Potts (In re Potts)*, 501 B.R. 711, 726 (Bankr. D. Colo. 2013)); *Pinnacle Agric. Distrib., Inc. v. Gamble (In re Gamble)*, 16-80193, 2018 WL 3629968, at *11 (Bankr. E.D. Okla. July 27, 2018); *In re Spitko*, 357 B.R. at 319.

[176] *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir. 1984); *In re Zell*, 108 B.R. at 629.

[177] *In re Phouminh*, 339 B.R. at 247.

[178] *Baum*, 359 F.2d at 814.

explanation to be "satisfactory." The difficulty stems from the reality that the facts and circumstances of each case must be evaluated on their own; rarely will a specific form or type of evidence be appropriate in every case. As so here. While some courts have issued mandates that debtors must supplement their explanations with documentary evidence, others are quick to point out that such a requirement may not be appropriate in every case.[179] "The standard is one of reasonableness and credibility."[180]

"While the debtor must provide the Court with more than mere generalized, vague, and uncorroborated statements in oral testimony, the Code provision does not dictate denial of discharge for failure to produce corroborating papers *where the debtor's testimonial assertions bear sufficient credibility*."[181] The existence or lack of corroborating documentation is *generally*

---

[179] *Compare In re Chalik*, 748 F.2d at 619 ("Vague and indefinite explanations of losses that are based upon estimates uncorroborated by documentation are unsatisfactory."), *and Stathopoulos v. Bostrom (In re Bostrom)*, 286 B.R. 352, 364 (Bankr. N.D. Ill. 2002) ("First, [the explanation] must be supported by at least some documentation."), *aff'd*, 02 C 9451, 2003 WL 403138 (N.D. Ill. Feb. 20, 2003), *and Structured Asset Servs., LLC v. Self (In re Self)*, 325 B.R. 224, 252 (Bankr. N.D. Ill. 2005) ("Merely offering a general oral explanation for the disappearance of substantial assets without documentary corroboration is not enough to overcome a § 727(a)(5) objection to discharge."), *and First Com. Fin. Group v. Hermanson (In re Hermanson)*, 273 B.R. 538, 545-46 (Bankr. N.D. Ill. 2002) (The explanation "must be supported by at least some documentation."), *with First Am. Bank of N.Y. v. Bodenstein (In re Bodenstein)*, 168 B.R. 23, 34 (Bankr. E.D.N.Y. 1994) ("[T]he preferable rule would not mandate denial of discharge for failure to produce corroborating papers where the debtor's testimonial explanation bears sufficient credibility. An interpretation of 11 U.S.C. § 727(a)(5) mandating documentary corroboration in all instances at a peril of losing a discharge would impermissibly strip purpose and meaning from 11 U.S.C. § 727(a)(3), an independent and separate basis for denying a discharge." (citations omitted)), *and In re Devaul*, 318 B.R. at 840 (same), *and In re Spitko*, 357 B.R. at 318–20 (same).

[180] *In re Zell*, 108 B.R. at 629. *See also In re Devaul*, 318 B.R. at 839 ("The debtor's explanation 'must be reasonable and credible so as to satisfy the court that the creditors have no cause to wonder where the assets went.'" (quoting *Union Bank of the Middle East Ltd v. Farouki (In re Farouki)*, 133 B.R. 769, 777 (Bankr. E.D. Va. 1991))).

[181] *In re Zell*, 108 B.R. at 629 (emphasis added).

*relevant to the credibility of an explanation*, but this Court declines to hold that an explanation must always be supported by records to be satisfactory.[182]

The Court does not expect debtors to be able to trace every penny they spent during the years prior to filing bankruptcy. However, given their burden to provide a satisfactory explanation once a prima facie case has been laid, debtors cannot expect to respond to questions regarding their financial activities with a cursory "I don't know" or "I did not keep records" and expect to obtain a discharge.[183] Courts should not focus on the wisdom or morality of a debtor's disposition of assets; the focus lies in the truth, detail, and completeness of the debtor's explanation of the loss.[184] Similarly, there is no requirement that the plaintiff make a showing of fraud or intent to hide assets, only that they have not been accounted for with a satisfactory explanation.[185]

As with § 727(a)(3), the court may consider all of the relevant facts and circumstances surrounding a loss of assets, including the amount and nature of the lost assets, the nature of the debtor's business, and the debtor's education and financial and business sophistication.[186] "To be satisfactory, the explanation must demonstrate the debtor has exhibited good faith in conducting his affairs and explaining the loss of assets."[187] While a focus on the two years before

---

[182] *In re Devaul*, 318 B.R. at 840; *In re Spitko*, 357 B.R. at 318–20.

[183] *In re Morris*, 302 B.R. at 743.

[184] *In re Self*, 325 B.R. at 250; *In re Spitko*, 357 B.R. at 318–20; *Shappell's Inc. v. Perry (In re Perry)*, 252 B.R. 541, 550 (Bankr. M.D. Fla. 2000) ("the issue is whether the explanation satisfactorily describes what happened to assets; not whether what happened to assets was proper.").

[185] *In re Perry*, 252 B.R. at 549; *In re Self*, 325 B.R. at 251 ("[A] debtor's failure to satisfactorily justify a substantial loss of assets need not be the product of fraudulent intent.").

[186] *In re Devaul*, 318 B.R. at 840; *In re Zell*, 108 B.R. at 629 ("[T]he question of satisfactoriness turns on the nature of the debtor's business, financial affairs, and lifestyle. The court, again, is given wide discretionary powers to make its determination in view of all the mitigating evidence presented by the debtor." (citation omitted)).

[187] *Bay State Milling Co. v. Martin (In re Martin)*, 141 B.R. 986, 999 (Bankr. N.D. Ill. 1992).

commencement of the case is common, numerous cases have found inquiries beyond a two-year period to been warranted.[188] How far back in time a court should look is case-specific, and may depend the nature of the assets and the amount of assets alleged to have been dissipated.[189] A greater loss of assets may justify a further reach back into a debtor's financial past.[190]

### *Plaintiffs have established a prima facie case under § 727(a)(5)*

Plaintiffs have met their burden to show the Links have lost substantial assets in the years immediately preceding the Petition Date. As recently as June 2018, the Links represented that they had a net worth of $7.5 million. In 2016, they received approximately $2.2 million from the sale of the Yacht. In May 2017 and March 2018, they received approximately $3.2 million, after payment of secured debts, from the sale of the Ranch and related personal property. And yet by the Petition Date, the Links disclosed assets of less than $80,000. The Plaintiffs have proven that the Links owned or had direct control over substantial and identifiable assets just a few short years before the Petition Date, and that those assets are no longer available for their creditors. Given the vast loss of wealth at issue, the Court finds it appropriate to reach beyond the standard two-year period to ask the Links to explain their financial losses.

---

[188] *See, e.g., In re D'Agnese,* 86 F.3d 732, 734 (7th Cir. 1996) (expanding the focus to nine years pre-petition); *In re Potts*, 501 B.R. at 724 (more than 2 years); *In re Hermanson*, 273 B.R. at 551–52 (6 years); *SE Prop. Holdings, LLC v. Stewart* (*In re Stewart*), 15-12215, 2022 WL 3209467 (Bankr. W.D. Okla. Aug. 3, 2022) (7 years); *In re Perry*, 252 B.R. at 550 ("As is the case with inquiry under Section 727(a)(3), there is no time limitation under Section 727(a)(5) as to events and transactions occurring within a specific number of months or years before the bankruptcy case.").

[189] *In re Stiff*, 512 B.R. at 900 ("[A] look at the cases that do extend the look-back period past two years reveal, unsurprisingly, a common factor: lost assets of substantial value relative to debtors' liabilities."); *In re Cohen v. Olbur (Olbur)*, 314 B.R. 732, 741 (Bankr. N.D. Ill. 2004) ("How long ago is too long ago depends on the case; there is no hard and fast rule.").

[190] *In re Stiff*, 512 B.R. at 901 ("This concern with the size of lost assets in determining how long to look back is, in the Court's view, highly appropriate; the text of § 727(a)(5) itself directs the court to look to 'any loss of assets or deficiency of assets *to meet the debtor's liabilities.*'" (quoting § 727(a)(5))).

### *The Links' explanation*

When asked to explain how they lost such vast sums in the years before the Petition Date, the Links rely primarily on bank statements and Tucker Link's verbal explanations. The bank statements show massive intercompany transfers of cash between numerous Link Entities, without further documentation of the nature or purpose of the transfers. Tucker Link described many of the transfers as loans or the repayment of loans. While some promissory notes were provided documenting intercompany loans, Tucker Link's testimony made it clear that he simply directed funds where and when they were needed without any expectation that they would be repaid or collected. His testimony and actions make it clear that any intercompany loan documentation was created solely for the purpose of creating a paper trail for tax purposes.

Tucker Link's basic explanation of the loss of the Links' fortune is that sometime after 2015, they entered "liquidation mode." That phase, which continued until the Petition Date, involved the shuffling of funds between the Link Entities as needed to cover debts and keep the operations afloat. Beyond bank statements showing the movement of funds, there were no books or records provided to verify or substantiate his rationale for the constant movement of funds among the various entities. Creditors and parties in interest are just expected to take his word for it. In the absence of sufficient records, the Plaintiffs and the Court are unable to understand the loss of substantial assets and are forced to speculate as to what happened to the money.

Despite the voluminous collection of bank statements from many of the Link Entities, neither the Plaintiffs nor the Court were able to make heads or tails of their business operations. The Links engaged in an elaborate shell game wherein millions of dollars were shuffled between the various Link Entities as need arose. None of that money is traceable in a coherent way from the documents provided. With a few notable exceptions where specific losses can be traced, the

Links appear to have simply frittered away a vast fortune over several years just prior to filing bankruptcy. The documents provided to the Plaintiffs, no matter how voluminous, do not explain why or how those losses occurred. The Court is left with a "cloud of doubt" regarding the Links' pre-petition activity and whether substantial assets might be available for recovery for the benefit of creditors.[191] The Links have not satisfactorily explained how they lost millions of dollars in assets in the years prior to the Petition Date such that they are now unable to meet their liabilities. The Plaintiffs have met their burden by a preponderance of the evidence, and the Links' discharge will be denied under § 727(a)(5).

Having determined that the Links are not entitled to a discharge under § 727(a)(3) and (a)(5), the Court need not reach any issues under § 727(a)(2) or (a)(4) or § 523(a)(1)(C).

**Conclusion**

Louis Tucker Link and Vickie Bocox Link are not entitled to and shall not be granted a discharge in Case No. 21-10221-M. A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

Dated this 22nd day of November, 2024.

7961.12

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

---

[191] *See In re Phouminh*, 339 B.R. at 247.